**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

| | |
|---|---|
| **EDWIN AND SHANNA SOLIS**<br>46460 Midway Drive<br>Lexington Park, MD 20653<br><br>**JAMES GILBERT**<br>6758 Canterbury Road<br>Felton, DE 19943<br><br>**JEFFREY MARKLE**<br>9210 Snyder Lane<br>Perry Hall, MD 21128<br><br>**MARTA CHANEY**<br>5501 Suffield Court<br>Columbia, MD 21044<br><br>*Plaintiffs*,<br><br>v.<br><br>**EMERY FEDERAL CREDIT UNION**<br>7890 East Kemper Road<br>Cincinnati, OH 45249<br><br>    <u>Serve on:</u> Emery Federal Credit Union<br>              7890 East Kemper Road<br>              Cincinnati, OH 45249<br><br>*Defendant*. | Civil Action No.: 1:19-cv-387 |

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Edwin and Shanna Solis, James Gilbert, Jeffrey Markle, and Marta Chaney, on behalf of themselves and the entire class of persons similarly situated, by and through their attorneys, Gregory M. Utter and Melissa S. Matthews of Keating Muething & Klekamp, PLL, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC, and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald

1

and Laake, P.A., file this Class Action Complaint, sue the Defendant for cause, claim damages, and state as follows:

## INTRODUCTION

1.  Plaintiffs Edwin and Shanna Solis (the "Solis Plaintiffs"), James Gilbert, Jeffrey Markle, and Marta Chaney (collectively, "Plaintiffs"), and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by Emery Federal Credit Union ("Emery"), which was or is secured by residential real property.

2.  Plaintiffs and alleged Class Members are victims of an illegal kickback and price fixing scheme (the "All Star Scheme") between Emery and All Star Title, Inc. ("All Star"), a Maryland title and settlement services company.

3.  Under the All Star Scheme, Emery, by and through its branch managers, loan officers, agents and/or other employees, received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services (the "Kickback Agreement"). Emery's conduct violates the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.* Notably, Emery and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the Kickback Agreement.

4.  As an essential component of the All Star Scheme, All Star conspired to and formed a cartel with various residential mortgage lenders (the "All Star Lender Cartel"). Emery participated in the All Star Lender Cartel and, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, entered into naked price fixing agreements (the "Price Fixing

Agreement"), minimum pricing agreements (the "Minimum Pricing Agreement"), and refusal to deal agreements (the "Refusal to Deal Agreement") (collectively, the "Cartel Agreements") with All Star related to the residential mortgage loans generated by All Star's illegal kickback payments to Emery.

5.    Emery benefitted, and continues to benefit from the Cartel Agreements, because the supracompetitive charges for title and settlement services charged to Emery borrowers under the Cartel Agreements were financed into the borrowers' loans and ensured the continued funding of illegal kickback payments.

6.    Emery and All Star continuously and regularly used the U.S. Mail and interstate wires in furtherance of the All Star Scheme, and to identify, lure, and defraud borrowers into the All Star Scheme, willfully and intentionally engaging in a pattern of racketeering activity over a period of two and a half years.

7.    Emery and All Star fraudulently concealed the Kickback Agreement, the Cartel Agreements, and the resulting supracompetitive prices from Plaintiffs and alleged Class Members by laundering kickbacks through third party marketing companies, creating sham invoice and payment records, making fraudulent representations in marketing materials, falsely allocating title and settlement fees and manipulating the APR associated with Emery loans, and making false and fraudulent representations and omissions in Emery borrowers' loan documents.  Emery's and All Star's actions to fraudulently conceal their conduct prevented borrowers, regulators, and auditors from discovering the All Star Scheme, the Kickback Agreement, the Cartel Agreements, and the injuries to Emery borrowers therefrom, and allowed the kickbacks and supracompetitive fees to continue.

## PARTIES

8.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

9.    Plaintiffs Edwin and Shanna Solis are citizens and residents of St. Mary's County, Maryland.

10.   Plaintiff James Gilbert is a citizen and resident of Kent County, Delaware.

11.   Plaintiff Jeffrey Markle is a citizen and resident of Baltimore County, Maryland.

12.   Plaintiff Marta Chaney is a citizen and resident of Howard County, Maryland.

13.   Defendant Emery Federal Credit Union is a federally chartered credit union with its headquarters and principal place of business located in Cincinnati, Ohio, located in Hamilton County, Ohio.  It is engaged in the business of consumer mortgage brokering, origination and/or lending, and otherwise transacted business in Ohio and elsewhere.

## JURISDICTION AND VENUE

14.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Section 4 of the Sherman Act, 15 U.S.C. § 4.

15.   This Court has personal jurisdiction over the parties.  Personal jurisdiction over Emery is appropriate because Emery maintains its principal place of business in this District and currently transacts business in this District.  In addition, during the time period alleged herein Emery continuously transacted business within this District and engaged in the All Star Scheme that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District.

16.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2), 15 U.S.C. § 22 and 18 U.S.C. § 1965.

**FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF**

17. At all relevant times, All Star was a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration. All Star was a licensed title and settlement service provider in more than 30 states, and it provided title and settlement services on residential mortgage loans, refinances, and reverse mortgages secured by real property in 47 states.

**I.     The All Star Scheme**

18. Beginning by at least 2008, All Star designs and executes the All Star Scheme with lenders and their branch managers, mortgage brokers, loan officers and other employees (collectively, "Participating Lenders") to charge borrowers higher prices for title and settlement services and to defraud borrowers of their money through the use of U.S. Mail and interstate wires.

   **A.     All Star Pays Kickbacks in Exchange for Participating Lenders' Assignment and Referral of Loans to All Star for Title and Settlement Services.**

19. The first component of the All Star Scheme involves All Star agreeing to pay kickbacks to Participating Lenders in exchange for the Participating Lenders' assignment and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services.

20. All Star bases the amount of the kickback on the number of loans the Participating Lender assigns and refers to All Star under the Kickback Agreement and the amount of profit All Star realizes on those loans.

21. All Star pays, and Participating Lenders receive and accept, kickbacks in furtherance of the All Star Scheme in different forms laundered by and through different channels.

22.     In some instances, All Star chooses to pay the kickback by purchasing and delivering to a Participating Lender marketing materials for the Participating Lender to use in soliciting borrowers, most commonly postage to be used by a Participating Lender to send direct mail solicitations.

23.     In other instances, All Star chooses to pay cash kickbacks by checks written directly to a Participating Lender and/or their branch manager, mortgage brokers, loan officers or other employees.  Often, a Participating Lender, or its employee, receives and accepts a kickback check laundered by and through a sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same.  In most instances, to conceal and launder the kickbacks paid and received under the All Star Scheme, Participating Lenders and All Star agree to launder the kickback payment through a third party marketing company, instead of issuing a check directly to the Participating Lender.

24.     Participating Lenders frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing or live transfer leads providers) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances, and reverse mortgages, which increase the volume of loans the Participating Lender brokers or originates, thereby increasing its net profit and commissions earned.

25.     All Star and Participating Lenders use a variety of third party marketing companies to launder the kickbacks, for example, Azevedo Solutions Group, Influence Direct, Best Rate Referral, Mortgageleads.com, and Titan Mail & List.  Some of these marketing companies specialize in direct mail, while others specialize in producing data and leads lists of potential borrowers for direct mail or telemarketing solicitations.  Still other third party marketing companies provide Participating Lenders with "live transfer" leads in

which a borrower who contacts a centralized telemarketing company is transferred "live" to the Participating Lender.

26.     To even further conceal the kickbacks and the Kickback Agreement, All Star and Participating Lenders request and cause the third party marketing company to issue sham invoices falsely stating the payment is being made by All Star for the purpose of purchasing marketing services from the third party marketing company. These sham invoices create the false impression that All Star is purchasing marketing services when in fact the payment is a kickback the Participating Lender is receiving and accepting in exchange for the assignment and referral of loans to All Star.

27.     The sham invoices conceal the fact that a "thing of value" is exchanged between All Star and the Participating Lender related to the loans the Participating Lender assigns and refers to All Star under the Kickback Agreement.

28.     In some instances, All Star and the Participating Lender direct the third party marketing company to issue sham "split" invoices to both All Star and the Participating Lender for a portion of the amount due to the third party marketing company.

29.     All Star and Participating Lenders' choice to use the split invoices creates the false impression that All Star purchased and received marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star. The sham split invoices also hide All Star and the Participating Lender's coordinated business relationship because there is no Participating Lender listed on the sham split invoice received and paid by All Star.

30.     In other instances, All Star and Participating Lenders choose to conceal the kickback payment entirely by creating sham payment records. To do this, a Participating Lender

7

directs All Star to launder a kickback through the third party marketing company without the use or issuance of any invoice. Other times, the Participating Lender forwards to All Star an invoice addressed to the Participating Lender, and All Star launder a kickback through a third party marketing company by simply referencing the Participating Lender's invoice number.

31. All Star and Participating Lenders choose to use sham invoices and payment records to conceal the fact that any kickback payment is made by All Star, as well as the fact that All Star and the Participating Lender exchanged a "thing of value" related to the loans assigned and referred to All Star under the Kickback Agreement.

32. Over time, All Star chooses to perform the Kickback Agreement using many different "things of value" and, in particular, "things of value" that are easy to conceal and difficult to trace (*e.g.*, gift cards and catered meals).

33. All Star makes clear that the kickback payments are predicated on and will continue only if the Participating Lender meets a "unit goal" or "production" goal of loans that are assigned and referred to All Star in exchange for the kickback. *See, e.g.*, June 22, 2011 e-mail re: "unit goal" expectations, attached as **Exhibit 1**. With the laundering of the kickbacks through third party marketing companies and the use of sham invoices and payment records, All Star and Participating Lenders hoped to be able to use claims of "co-marketing" as a sham and to further conceal the kickbacks and Kickback Agreement from borrowers, regulators and law enforcement.

**B.** **All Star and Participating Lenders Form the All Star Lender Cartel, Conspire and Agree to Fix Prices for Title and Settlement Services, and Refuse to Deal with All Star Competitors.**

34. One of the purposes of the All Star Scheme is to allow All Star to charge borrowers higher prices for title and settlement services than is possible in a competitive market and to exclude other title companies from the market for title and settlement services on residential mortgage loans, refinances, and reverse mortgages.

35. To achieve these purposes, All Star and Participating Lenders conspire to and form the All Star Lender Cartel, enter agreements, and act in restraint of trade.

36. To enforce the All Star Lender Cartel, All Star and Participating Lenders enter into the Price Fixing Agreement, conspiring and agreeing to fix the prices All Star charges Participating Lenders' borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement.

37. In addition, All Star and Participating Lenders enter into the Minimum Fee Agreements, conspiring and agreeing to minimum prices to charge borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement.

38. The Price Fixing and Minimum Fee Agreements are enforced by the Refusal to Deal Agreement – an agreement that the Participating Lender refuses to deal with any other title and settlement services company on those loans generated by the kickbacks, such that all loans generated by the Kickback Agreement are referred to All Star and are subject to the Price Fixing and Minimum Fee Agreements.

39. The prices All Star and the Participating Lenders fix under the Price Fixing and Minimum Fee Agreements are supracompetitive and higher than the prices that

borrowers would otherwise be charged for title and settlement services in a competitive market and without the Cartel Agreements.

40.    An additional purpose of the All Star Lender Cartel formed by All Star and Participating Lenders under the Kickback and Cartel Agreements is to exclude All Star's competitors from the market for title and settlement services on residential mortgage loans, refinances, and reverse mortgages, and to deprive borrowers of their choice of title and settlement service provider on loans generated by the All Star-funded kickbacks.

41.    Participating Lenders benefit from the Cartel Agreements and the All Star Scheme in the following ways: (i) the supracompetitive pricing is used to fund the illegal kickbacks, which Participating Lenders use to solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions, and (ii) the costs for title and settlement service fees are financed into the loan and paid for by borrowers from loan proceeds such that the Participating Lender earns interest and other fees from the supracompetitive pricing.

**C.    All Star and the Participating Lenders Use the U.S. Mail and Interstate Wires to Identify and Lure Borrowers into the All Star Scheme.**

42.    All Star and Participating Lenders engage in the All Star Scheme to defraud borrowers into paying supracompetitive prices for title and settlement services and to thereby fund and continue the kickbacks All Star is paying Participating Lenders.

43.    In service of these intentions, Participating Lenders and All Star use the kickback payments to lure borrowers into the All Star Scheme, and in turn use the interstate mails and wires to identify, solicit, and lure borrowers into the All Star Scheme.

44.    Potential borrowers are identified by the third party marketing companies through which All Star and Participating Lenders are laundering the kickbacks.  Many of these third

party marketing companies specialize in identifying and soliciting potential borrowers, and compiling and selling borrower data and marketing "leads lists."

45. Participating Lenders use these lists to solicit borrowers, often through printed direct mail pieces such as postcards, letters, "SNAP packs" (mailers with perforated edges the recipient rips or "snaps" open), and other printed materials, which encourage borrowers to contact the Participating Lender to apply for a residential mortgage loan, refinance or reverse mortgage.

46. All Star requires, and Participating Lenders agree, to include false representations in the Participating Lender's direct mail borrower solicitations, stating that a potential borrower would save "30-40% on title fees" by using All Star. The purpose of these false representations is to: (i) prevent a borrower from trying to use a different title and settlement services company for the loan; (ii) conceal the fixed, supracompetitive pricing resulting from the All Star Scheme; and (iii) create the false representation that the prices charged to the borrower for title and settlement services would be lower than the prices charged by All Star competitors.

47. Participating Lenders and All Star, by and through third party marketing companies, cause borrower data and "leads lists" to be merged onto these direct mail solicitations, and Participating Lenders, by and through the third party marketing companies, cause these fraudulent solicitations to be sent through the interstate U.S. mails, in violation of 18 U.S.C. § 1341.

48. All Star and Participating Lenders also obtain from third party marketing companies borrower data and "leads lists" to solicit borrowers over the telephone, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers, in

11

violation of 18 U.S.C. § 1343. Plaintiffs believe, and therefore aver, that All Star requires, and Participating Lenders agree, to make false representations to borrowers in these telephone solicitations similar to the false representations that All Star and Participating Lenders agree to include in direct mail solicitations.

49. Participating Lenders also receive "live transfer" leads wherein a borrower calls a centralized call center, and then is transferred by the call center "live" to the Participating Lender. The third marketing company delivering the live transfer leads transmits the "live transfer" over interstate wires, and the Participating Lender receives the live transfer calls over interstate wires, in violation of 18 U.S.C. § 1343.

50. According to All Star's records, these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme.

51. All Star and Participating Lenders also administer the Kickback and Cartel Agreements over interstate wires, negotiating, agreeing to, and enforcing the fixed prices and refusal to deal by and through communications over interstate wires.

52. All Star and Participating Lenders also choose to use interstate mails and wires to transmit, receive, and accept illegal kickback payments, as well as to transmit, receive, and accept the sham invoices and payment records that conceal the Kickback and Cartel Agreements.

53. The activities of the All Star Scheme affect interstate commerce across more than 40 states.

**II.  By 2011, Emery and All Star Form an Association in Fact Enterprise and Emery Begins Participating in the All Star Scheme.**

54.    By at least 2011, Emery, by and through its branch managers, loan officers and other employees, agrees to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of Emery loans to All Star for title and settlement services.

55.    Over a period of two and a half years, All Star pays, and Emery receives and accepts, over 100 kickbacks totaling over $300,000.00 that are laundered by and through third party marketing companies.

56.    At all relevant times, the Emery branch managers and loan officers participating in the All Star Scheme are licensed mortgage brokers and/or authorized loan officers, and at all relevant times were acting within the scope of the business relationship and their employment on behalf of Emery, specifically seeking borrowers and originating and securing loans for residential mortgages through Emery and/or brokering such loans through Emery to other lenders with whom Emery authorized, referring Emery borrowers to title companies, and working with title companies to close these loans.  All activities, including any interaction with All Star, were for the benefit of Emery.

57.    As detailed below, Emery participates in the All Star Scheme by and through at least eleven different Emery branches.

**A.    Emery Participates in the All Star Scheme By and Through the Emery White Marsh Branch.**

58.    In or about August 2011, Emery opens an Emery branch at 7929 Honeygo Boulevard in White Marsh, Maryland 21236 (the "Emery White Marsh Branch").

59.    As described in more detail below, beginning shortly after the Emery White Marsh Branch opens and continuing through at least January 2014, and, on information and belief, longer, Emery receives and accepts over $50,000 in kickbacks from All Star for Emery loans assigned and referred to All Star from the Emery White Marsh Branch

pursuant to the Kickback Agreement.[1]   During the same time period, Emery charges supracompetitive prices for title and settlement services in performance of the Cartel Agreements.  These two components of the All Star Scheme are intertwined – in order to pay for the kickbacks under the Kickback Agreement, Emery and All Star agree to charge supracompetitive prices, passing the increased cost along to the borrowers.

      **1.**        **In 2011, Emery Receives and Accepts Close to $1,000 in Kickbacks from All Star for Loans Assigned and Referred to All Star from the Emery White Marsh Branch.**

60.     On or about October 27, 2011, All Star pays a $154.50 kickback to Emery laundered by and through Lendanear Data & Direct Mail Services ("Lendanear"), a Tennessee-based data and direct mail marketing company. **Exhibit ("Ex.") 2-1** (sham invoice), **Ex. 2-3** (payment record).  The sham invoice refers to Craig Dowling ("Dowling"), a loan officer employed by Emery at the Emery White Marsh Branch.

61.     The sham invoice identifies that Emery receives borrower credit data for borrowers in all states in which All Star is licensed.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland.  Later, Emery causes this data to be merged into and onto fraudulent direct mail pieces, described below, that Emery causes to be placed in the interstate mails in furtherance of the All Star Scheme.

---

[1] All of the sham invoice and payment records associated with the kickbacks on Emery loans assigned and referred from the Emery White Marsh Branch are collected in Exhibit 2 in chronological order.  For ease of reference, page numbers have been placed on each page of Exhibit 2 and will be referenced in the following format: Ex. No. - Page No.  For example, Ex. 2-10 designates a document in Exhibit 2 beginning at page 10. The page numbers have been added and do not appear in the original documents.

62.     All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

63.     That same day, All Star pays a $685.69 kickback to Emery laundered by and through Influence Direct ("Influence Direct"), a Tennessee-based direct mail marketing company. **Ex. 2-4** (sham invoice), **Ex. 2-5** (payment record).

64.     The sham invoice, which again references Emery's loan officer Dowling, identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

65.     All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

66.     The next month, on or about November 29, 2011, All Star pays a $154.50 kickback to Emery laundered by and through Lendanear. **Ex. 2-6** (sham invoice), **Ex. 2-7** (payment record).

67.     The sham invoice references Emery's loan officer Dowling and identifies that Emery receives borrower credit data for borrowers in twelve states. Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate

wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland.

68. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

        **2.**    **In the First Quarter of 2012, Emery Quadruples the Amount It Receives and Accepts from All Star for Loans Assigned and Referred from the Emery White Marsh Branch, Taking in More Than $4,000 in Kickbacks in Three Months**

69. A month and a half later, on or about January 12, 2012, All Star pays a $1,417.62 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-8** (sham invoice), **Ex. 2-9** (payment record).

70. The sham invoice again refers to Emery's loan officer Dowling and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

71. All Star also chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

72.     One month later, on or about February 8, 2012, All Star pays a $167.44 kickback to Emery laundered by and through Lendanear. **Ex. 2-10** (sham invoice), **Ex. 2-11** (payment record).

73.     The sham invoice references Emery's loan officer Dowling and identifies that Emery receives borrower credit data for borrowers across multiple states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland.  Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and to be placed in the interstate U.S. Mail in furtherance of the All Star Scheme.

74.     All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

75.     That same day, All Star pays a $1,345.50 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-12** (sham invoice), **Ex. 2-13** (payment record).

76.     Emery causes Influence Direct to print and mail solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

77.     All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

78. Less than a month later, on or about February 28, 2012, All Star pays a $1,371.38 kickback to Emery laundered by and through Influence Direct. **Ex. 2-14** (sham invoice), **Ex. 2-15** (payment record).

79. The sham invoice, which again references Emery's loan officer Dowling, identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

80. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

> **3.** **In the Second Quarter of 2012, Emery Doubles its First Quarter Take, Receiving and Accepting More than $8,000 in Kickbacks for Loans Assigned and Referred by the Emery White Marsh Branch**

81. On April 2, 2012, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear. **Ex. 2-16** (sham invoice), **Ex. 2-17** (payment record).

82. The sham invoice refers to Dowling, and identifies that Emery receives borrower credit data for borrowers in nine states. Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch

in Maryland. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and to be placed in the interstate U.S. mail in furtherance of the All Star Scheme.

83. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

84. Two days later, on or about April 4, 2012, All Star pays a $1,371.38 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-18** (sham invoice), **Ex. 2-19** (payment record.

85. The sham identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

86. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

87. One month later, on or about May 2, 2012, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear. **Ex. 2-20** (sham invoice), **Ex. 2-22** (payment record).

88.     The sham invoice references Emery's loan officer Dowling and identifies that Emery receives borrower credit data for borrowers in all states except AR, AZ, HI, NV, OK, TX, and WY. Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland. Later, Emery causes the credit data to merged into and on fraudulent borrower solicitations, described below, and placed in the U.S. Mail in furtherance of the All Star Scheme.

89.     All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

90.     On or about that same day, All Star pays a $1,423.13 kickback to Emery laundered by and through Influence Direct. **Ex. 2-23** (sham invoice), **Ex. 2-24** (payment record).

91.     The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

92.     All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

20

93.     Two weeks later, on or about May 16, 2012, All Star pays a $1,423.13 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-25** (sham invoice), **Ex. 2-26** (payment record).

94.     The sham invoice, again references Dowling, and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

95.     All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

96.     The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

97.     All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

98. Less than a month later, on or about June 12, 2012, All Star pays a $1,345.50 kickback to Emery laundered by and through Influence Direct. **Ex. 2-27** (sham invoice), **Ex. 2-28** (payment record). The sham invoice refers to Bryan McCrea ("McCrea"), a licensed mortgage loan officer and team manager employed by Emery at the Emery White Marsh Branch.

99. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

100. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

101. The next day, on or about June 13, 2012, All Star pays a $588.90 kickback to Emery laundered by and through Influence Direct. **Ex. 2-29** (sham invoice), **Ex. 2-30** (payment record. The sham invoice refers to James Ventura ("Ventura"), a loan officer employed by Emery at the Emery White Marsh Branch.

102. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

103. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

104. One week later, on or about June 20, 2012, All Star pays a $1,345.50 kickback to Emery laundered by and through Influence Direct. **Ex. 2-31** (sham invoice), **Ex. 2-32** (payment record).

105. The sham invoice, which again references Emery White Marsh Branch team manager and loan officer McCrea, identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

106. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

### 4. In the Third Quarter of 2012, Emery Increases its Take Yet Again, Receiving and Accepting More Than $12,000 in Kickbacks on Loans Assigned and Referred from the Emery White Marsh Branch

107. Two weeks later, on or about July 3, 2012, All Star pays a $1,345.50 kickback to Emery laundered by and through Influence Direct. **Ex. 2-33** (sham invoice), **Ex. 2-34** (payment record).

108. The sham invoice again refers to Emery White Marsh Branch team manager McCrea, and identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

109. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

110. That same day, All Star pays a $570.08 kickback to Emery laundered by and through Influence Direct. **Ex. 2-35** (sham split invoice), **Ex. 2-36** (payment record).

111. The sham invoice references Emery's loan officer Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

112. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

113.    One week later, on or about July 11, 2012, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear.  **Ex. 2-37** (sham invoice), **Ex. 2-39** (payment record).

114.    The sham invoice again references Emery's loan officer Dowling and identifies that Emery receives borrower credit data for borrowers across six states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland. Later, Emery causes this credit data to be merged into and on fraudulent borrower solicitations, described below, and be placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

115.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

116.    On or about that same day, All Star pays a $1,423.13 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-40** (sham split invoice), **Ex. 2-41** (payment record).

117.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

118.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

119. On or about that same day, All Star pays a $1,345.50 kickback to Emery laundered by and through Influence Direct. **Ex. 2-42** (sham split invoice), **Ex. 2-43** (payment record).

120. The sham invoice references Emery White Marsh Branch team manager and loan officer McCrea, and identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

121. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

122. All Star also pays a $595.79 kickback that day to Emery laundered by and through Influence Direct. **Ex. 2-44** (sham split invoice), **Ex. 2-45** (payment record). .

123. The sham invoice refers to Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

124. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

125. One week later, on or about July 18, 2012, All Star pays a $563.93 kickback to Emery laundered by and through Influence Direct. **Ex. 2-46** (sham split invoice), **Ex. 2-47** (payment record).

126. The sham invoice references Emery's loan officer Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

127. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

128. Approximately a week and a half later, on or about August 1, 2012, All Star pays a $618.15 kickback to Emery laundered by and through Influence Direct. **Ex. 2-48** (sham split invoice), **Ex. 2-49** (payment record).

129. The sham invoice again refers to Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are

placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

130. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

131. A week and a half after, on or about August 14, 2012, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear.  **Ex. 2-50** (sham invoice), **Ex. 2-52** (payment record).

132. The sham invoice references Emery's loan officer Dowling and identifies that Emery receives borrower credit data for borrowers in seven states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

133. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

134. On or about that same day, All Star pays a $1,397.25 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-53** (sham split invoice), **Ex. 2-54** (payment record).

135. The sham invoice again references Dowling, and identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

136. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

137. Three weeks later, on or about September 5, 2012, All Star pays a $558.90 kickback to Emery laundered by and through Influence Direct. **Ex. 2-55** (sham split invoice), Ex. **2-56** (payment record).

138. The sham invoice references Emery's loan officer Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

139. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

140.    The next week, on or about September 12, 2012, All Star pays another $581.26 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-57** (sham split invoice), Ex. **2-58** (payment record).

141.    The sham invoice again refers to Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

142.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

143.    The week after, on or about September 19, 2012, All Star pays a $1,081.58 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-59** (sham split invoice), **Ex. 2-60** (payment record).

144.    Again, the sham invoice refers to Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

145.  All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

146.  The next week, on or about September 26, 2012, All Star pays a $633.23 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-61**, (sham split invoice), **Ex. 2-63** (payment record).

147.  The sham invoice refers to Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

148.  All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

149.  On or about the same day, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear.  **Ex. 2-64** (sham invoice), **Ex. 2-66** (payment record).

150.  The sham invoice identifies that Emery receives borrower credit data for borrowers across fourteen states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland.  Later, Emery causes the credit data to merged into and on fraudulent borrower

solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

151.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

152.    On or about that same day, All Star pays another $1,397.25 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-67** (sham split invoice), **Ex. 2-68** (payment record).

153.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

154.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

**5.      In the Fourth Quarter of 2012, Emery Receives and Accepts More than $7,000 of Kickbacks on Loans Assigned and Referred from the Emery White Marsh Branch, Including $3,000 in Untraceable Gift Cards.**

155.    Three weeks later, on or about October 17, 2012, All Star pays a $572.87 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-69** (sham split invoice), **Ex. 2-70** (payment record).

156. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

157. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

158. The next week, on or about October 24, 2012, All Star pays a $690.80 kickback to Emery laundered by and through Influence Direct. **Ex. 2-71** (sham split invoice), **Ex. 2-72** (payment record).

159. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

160. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

161. Two weeks later, on or about November 7, 2012, All Star pays a $584.00 kickback to Emery laundered by and through Best Rate Referrals ("Best Rate"), a Nevada-based

direct mail marketing company.  **Ex. 2-73** (sham split invoice), **Ex. 2-75** (payment record).

162.    The sham invoice identifies that Best Rate processes, prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Nevada – and delivered to potential borrowers in other states.

163.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Best Rate, in Nevada.

164.    On or about the same day, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear.  **Ex. 2-76** (sham invoice), **Ex. 2-78** (payment record).

165.    The sham invoice identifies that Emery receives borrower credit data for borrowers in ten states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland.  Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the U.S. Mails in furtherance of the All Star Scheme.

166.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

167.    The next week, on or about November 12, 2012, All Star pays another $1,397.25 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-79** (sham split invoice), **Ex. 2-80** (payment record).

168.    The sham invoice refers to Dowling, and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

169.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

170.    One week later, on or about November 19, 2012, All Star pays a $584.00 kickback to Emery laundered by and through Best Rate.  **Ex. 2-81** (sham split invoice), **Ex. 2-83** (payment record).

171.    The sham invoice identifies that Best Rate processes, prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Nevada – and delivered to potential borrowers in other states.

172.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Best Rate, in Nevada.

173. The Emery White Marsh Branch in fact refers Emery loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements and pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme. *See* Oct. 10, 2012 and Dec. 5, 2012 e-mails, attached as **Exhibits 8** and **9**.

174. The next month, in December 2012, All Star pays a kickback to Emery laundered through over $3,000 in gift cards. The December 2012 All Star employee expense sheet refers to Emery White Marsh Branch team manager McCrea, as well as Brandon Hill and Steve Oh, two other loan officers employed by Emery at the Emery White Marsh Branch. **Ex. 2-84** (expense sheet), **Ex. 2-85** (payment record).

> **6.  The Kickbacks Continue in 2013, with Emery Receiving and Accepting More than $5,000 in Kickbacks for Loans Assigned and Referred by the Emery White Marsh Branch in the First Quarter of 2013.**

175. One month later, on or about January 15, 2013, All Star pays a $654.00 kickback to Emery laundered by and through Best Rate. **Ex. 2-86** (sham split invoice), **Ex. 2-88** (payment record).

176. The sham invoice identifies that Best Rate processes, prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Nevada – and delivered to potential borrowers in other states.

177. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Best Rate, in Nevada.

178.    A week later, on or about January 22, 2013, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear. **Ex. 2-89** (sham invoice), **Ex. 2-90** (payment record).

179.    The sham invoice identifies that Emery receives borrower credit data for borrowers in twelve states. Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

180.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

181.    The next day, on or about January 23, 2012, All Star pays a $1,423.13 kickback to Emery laundered by and through Influence Direct. **Ex. 2-91** (sham split invoice), **Ex. 2-92** (payment record).

182.    The sham invoice, which again references Emery's loan officer Dowling, identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that

is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

183.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

184.   A week and a half after, on or about February 5, 2013, All Star pays a $666.20 kickback to Emery laundered by and through Best Rate.  **Ex. 2-93** (sham split invoice), **Ex. 2-95** (payment record).

185.   The sham invoice identifies that Best Rate processes, prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Nevada – and delivered to potential borrowers in other states.

186.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Best Rate, in Nevada.

187.   Two and a half weeks later, on or about February 22, 2013, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear.  **Ex. 2-96** (sham invoice), **Ex. 2-97** (payment record).

188.   The sham invoice identifies that Emery receives borrower credit data for borrowers located in MD, CO, NC and OH.  Plaintiffs believe and therefore aver that the borrower

credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

189. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

190. A few days later, on or about February 26, 2013, All Star pays a $1,423.13 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-98** (sham split invoice), **Ex. 2-99** (payment record).

191. The sham invoice refers to Dowling, and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

192. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

193.    Less than one month later, on or about March 19, 2013, All Star pays a $853.88 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-100** (sham split invoice), **Ex. 2-101** (payment record).

194.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

195.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

>    **7.    In the Second Quarter of 2013, Emery Receives and Accepts Almost $10,000 in Kickbacks for Loans Assigned and Referred by the Emery White Marsh Branch, Again Including Thousands in Untraceable Gift Cards.**

196.    A week later, on or about April 3, 2013, All Star pays a $607.96 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-102** (sham split invoice), **Ex. 2-103** (payment record).

197.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

198.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

199.   A few days later, on or about April 9, 2013, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear.  **Ex. 2-104** (sham invoice), **Ex. 2-105** (payment record).

200.   The sham invoice identifies that Emery receives borrower credit data for borrowers located in CO, GA, OH, NC, SC, PA, TN, and VA.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland.  Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

201.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

202.   The next day, on or about April 10, 2013, All Star pays a $1,449.00 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-106** (sham split invoice), **Ex. 2-107** (payment record).

203.   The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs

believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

204. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

205. A few days later, on or about April 17, 2013, All Star pays another kickback to Emery laundered through over $2,000 in gift cards.  The April 2013 All Star employee expense sheet refers to Emery White Marsh Branch team manager McCrea and Emery loan officer Brandon Hill.  **Ex. 2-108** (expense sheet), **Ex. 2-109** (payment record).

206. The next week, on or about April 23, 2013, All Star pays a $837.37 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-111** (sham split invoice), **Ex. 2-112** (payment record).

207. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

208. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

209.    A week later, on or about April 30, 2013, All Star pays a $334.75 kickback to Emery laundered by and through Lendanear.  **Ex. 2-113** (sham invoice), **Ex. 2-115** (payment record).

210.    The sham invoice identifies that Emery receives borrower credit data for borrowers located in OR, MD, NJ, IL, and VA.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery White Marsh Branch in Maryland. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

211.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

212.    The next day, on or about May 1, 2013, All Star pays a $1,449.00 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-116** (sham split invoice), **Ex. 2-117** (payment record).

213.    The sham invoice refers to Dowling, and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

214.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

215.   On or about the same day, All Star pays a $775.39 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-118** (sham split invoice), **Ex. 2-119** (payment record).

216.   The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

217.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

218.   The next week, on or about May 7, 2013, All Star pays a $1,423.25 kickback to Emery laundered by and through Influence Direct.  **Ex. 2-120** (sham split invoice), **Ex. 2-121** (payment record).

219.   The sham invoice refers to Ventura, and identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

220.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

### 8.   In the Third Quarter of 2013, Emery Doubles the Amount of Untraceable Gift Cards it Receives from All Star for Loans Assigned and Referred from the Emery White Marsh Branch to Over $4,000.

221.   The next month, on or about June 19, 2013, All Star pays a kickback to Emery laundered through over $4,000 in gift cards. The June 2013 All Star employee expense sheet refers to Emery White Marsh Branch team manager McCrea and Emery loan officer Hill.  **Ex. 2-122** (expense sheet), **Ex. 2-124** (payment record).

222.   The following month, on or about July 19, 2013, All Star again pays another kickback to Emery laundered through over $4,000 in gift cards. The July 2013 All Star employee expense sheet refers to Emery White Marsh Branch team manager McCrea and Emery loan officer Hill.  **Ex. 2-125** (expense sheet), **Ex. 2-126** (payment record).

### 9.   During the Entire Time Emery is Receiving Kickbacks, Emery and All Star Charge Borrowers Fixed and  Supracompetitive Prices for Title and Settlement Services in Performance of the Cartel Agreements.

223.   Around the same time that Emery begins paying kickbacks to the Emery White Marsh Branch, in December 2011, All Star and Emery conspire and agree to fix prices for title and settlement services associated with Emery loans referred to All Star by the Emery White Marsh Branch at the increasing fee schedule: "$100-150k at $1,500; 151-200k at $1,600; 201-300k at $1,800; and $300k+ at $1,990", inclusive of title insurance and application signing fees.  *See* Dec. 8, 2011 e-mail between All Star and Brandon Hill ("Hill"), Emery White Marsh Branch loan processor manager and loan officer, attached

as **Exhibit 3**. This agreement is memorialized by All Star in its January 3, 2012 Fee Spreadsheet, attached as **Exhibit 4**.

224. These fixed prices are approximately $50 to $890 more than All Star is charging other Participating Lenders for title and settlement services ("Kickback Overcharge"). This Kickback Overcharge is the minimum amount of actual damages incurred by Emery borrowers assigned and referred to All Star from the Emery White Marsh Branch in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme during this time period.

225. One purpose of the fixed and supracompetitive prices charged Emery borrowers under the Cartel Agreements is to fund the illegal kickbacks All Star is paying Emery under the Kickback Agreement, and for Emery to ensure to the kickbacks will continue.

226. In April 2012, while Emery is receiving thousands in kickbacks, All Star and Emery conspire and agree to fix prices for title and settlement services associated with Emery loans referred to All Star by the Emery White Marsh Branch higher, keeping the same fee structure above for loans closed in licensed states, but including an additional $450 fee for loans closed in attorney states (specifically DE, GA, MA, SC, and VT) – that is, states where state law requires an attorney conduct the settlement or closing of a residential mortgage loan ("Attorney State Surcharge"). In addition, All Star and Emery conspire and agree to fix prices for loans closed in unlicensed states to $750.00 plus title insurance plus a $150 application signing fee. *See* Apr. 3, 2012 spreadsheet, attached as **Exhibit 5**.

227. These fixed prices, including the Kickback Overcharge and Attorney State Surcharge, are approximately $100 to $940 more than the prices All Star has fixed with other

Participating Lenders. These amounts are the minimum amount of actual damages incurred by Emery borrowers assigned and referred to All Star from the Emery White Marsh Branch in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme during this time period.

228. A few months later, by June 2012, and as kickback payments are ongoing, All Star and Emery again increase the fixed prices charged for title and settlement services associated with Emery loans referred to All Star by the Emery White Marsh Branch to to $2,000 including title insurance, with the agreement that if title insurance is higher than $2,000 that the fees would reflect the higher amount.  In addition, All Star and Emery conspire and agree to fix prices for reverse mortgages to $3,000 including title insurance, with the agreement that if title insurance is higher than $3,000 that the fees would reflect the higher amount.  All Star and Emery additionally agree to increase the Attorney State Surcharge by $200.

229. All Star and Emery cause these fixed and supracompetitive prices to be programmed into "TitleHound", software All Star uses to produce borrower loan documents.  As a result, the fixed and supracompetitive prices are automatically inputted into borrower loans, thereby automatically performing the Cartel Agreements and concealing the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.  *See* June 13, 2012 e-mail to TitleHound, attached as **Exhibit 6**.

230. In addition, All Star and Emery conspire and agree to fix prices for title and settlement services associated with Emery loans to also include a $100 application signing fee

("Application Signing Surcharge").  *See* June 26, 2012 Jason's Fee Sheet, attached as **Exhibit 7**.

231.  These fixed prices for title and settlement services are approximately $150 to $950 more than All Star has fixed with other Participating Lenders.  This Kickback Overcharge, plus any applicable Attorney State Surcharge and Application Signing Surcharge, is the minimum amount of actual damages incurred by Emery borrowers assigned and referred to All Star by the Emery White Marsh Branch in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme during this time period.

232.   The Emery White Marsh Branch and All Star agree to and perform the Kickback and Cartel Agreements through at least January 2014, and, on information and belief, longer. *See* Jan. 13, 2014 Title Fee Structure Chart, attached as **Exhibit 10**.  All Star and Emery charge Emery borrowers the fixed and minimum prices under the Cartel Agreements on over 500 Emery loans assigned and referred from the Emery White Marsh Branch and secured by real property in 42 states and the District of Columbia.

**B.**  **Emery Participates in the All Star Scheme By and Through the Emery Forest Hill Branch.**

233.  All Star additionally pays kickbacks to Emery by and through its branch located at 350 Bynum Road, Forest Hill, Maryland 21050 ("Emery Forest Hill Branch").

234.  As described in more detail below, beginning on or about August 15, 2012 and continuing through at least January 2014, and, on information and belief, longer, the Emery Forest Hill Branch receives and accepts over $40,000 in kickbacks from All Star

pursuant to the Kickback Agreement.[2]  During the same time period, Emery charges

supracompetitive prices for title and settlement services in performance of the Cartel

Agreements.

> **1.** **By the Third Quarter of 2012, Emery Receives and Accepts Almost $7,000 in Kickbacks for Loans Assigned and Referred from the Emery Forest Hill Branch.**

235.    On or about August 15, 2012, All Star pays a $1,250.00 kickback to Emery that is

laundered by and through Azevedo Solutions Group Inc. ("Azevedo"), a California based

marketing company.  **Exhibit ("Ex.") 11-1** (sham invoice), **Ex. 11-2** (payment record).

The sham invoice refers to Gary Becker ("Becker"), a loan officer employed by Emery at

the Emery Forest Hill Branch.

236.    The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo.

Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the

"live transfer" calls is not located in Maryland such that the "live transfer" calls are

transmitted over interstate wires, with the live transfer call originating in one state and

being transferred to the Emery Forest Hill Branch, in a different state.

237.    All Star chooses to transmit the kickback payment over interstate wires, with All Star

emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland,

and Emery receiving the payment, by and through Azevedo, in California.

---

[2] All of the sham invoice and payment records associated with the kickbacks on Emery loans assigned and referred from the Emery Forest Hill Branch are collected in Exhibit 11 in chronological order. Page numbers have been added to each page of Exhibit 11 and are referenced in the same "Ex. No. - Page No." format.

238.    Two weeks later, on or about August 29, 2012, All Star pays another $1,250.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-3** (sham invoice), **Ex. 11-4** (payment record).  Again, the sham invoice refers to Emery loan officer Becker.

239.    The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

240.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

241.    One week later, on or about September 6, 2012, All Star pays a $1,500.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-5** (sham invoice and payment record).  The sham invoice refers to Alexander Mavroulis ("Mavroulis"), a loan officer employed by Emery at the Emery Forest Hill Branch.

242.    The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

243.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

244.  A week and a half later, on or about September 17, 2012, All Star pays a $1,250.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-6** (sham invoice), **Ex. 11-7** (payment record).  The sham invoice refers to Emery loan officer Becker.

245.  The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

246.  All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

247.  Two days later, on or about September 19, 2012, All Star pays a $1,500.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-8** (sham invoice), **Ex. 11-9** (payment record).  The sham invoice refers to Emery loan officer Mavroulis.

248.  The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

249. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

### 2. In the Fourth Quarter of 2012, Emery Increases its Take for Loans Assigned and Referred from the Emery Forest Hill Branch, Receiving Over $8,000 in Kickbacks.

250. On or about October 1, 2012, All Star pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-10** (sham invoice), **Ex. 11-11** (payment record). The sham invoice refers to Emery loan officer Becker.

251. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

252. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

253. Just over a week later, on or about October 10, 2012, All Star pays another $1,125.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-12** (sham invoice), **Ex. 11-13** (payment record).

254. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the

"live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

255. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

256. Five days later, on or about October 15, 2012, All Star pays a $750.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-14** (sham invoice), **Ex. 11-15** (payment record).

257. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

258. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

259. A week and a half later, on or about October 24, 2012, All Star pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-16** (sham invoice), **Ex. 11-17** (payment record).

260.    The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

261.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

262.    The following week , on or about November 12, 2012, All Star pays a $2,250.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-18** (sham invoice), **Ex. 11-19** (payment record).

263.    The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

264.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

265. Mavroulis tracks and submits regular ledgers to All Star of the Emery loans he in fact assigns and refers to All Star in furtherance of the Kickback and Cartel Agreements.  *See, e.g.*, e-mails between Jan. 26, 2012 through Mar. 5, 2013, attached as **Exhibit 12**.

266. A week later, on or about November 20, 2012, All Star pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-20** (sham invoice), **Ex. 11-21** (payment record).

267. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

268. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

269. One month later, on or about December 19, 2012, All Star pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-22** (sham invoice), **Ex. 11-23** (payment record).  The sham invoice refers to Chris Pilcher ("Pilcher"), a loan officer employed by Emery at the Emery Forest Hill Branch.

270. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are

transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

271. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

      **3.**      **Emery Receives More Than $12,000 in Kickbacks in the First Quarter of 2013 for Loans Assigned and Referred from the Emery Forest Hill Branch.**

272. Starting early in 2013, on or about January 3, 2013, All Star pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-24** (sham invoice), **Ex. 11-25** (payment record).

273. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

274. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

275. Less than a week  later, on or about January 8, 2013, All Star pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-26** (sham invoice), **Ex. 11-**

**27** (payment record). The sham invoice refers to Jason Filippou ("Filippou"), a loan officer employed by Emery at the Emery Forest Hill Branch.

276. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

277. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

278. That same day, All Star pays another $1,125.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-28** (sham invoice), **Ex. 11-29** (payment record).

279. According to the sham invoice, Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

280. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

281.　Two weeks later, on or about January 23, 2013, All Star pays a $1,500.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-30** (sham invoice), **Ex. 11-31** (payment record).

282.　The sham invoice refers to Becker, and identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

283.　All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

284.　That same day, All Star pays a $750.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-32** (sham invoice), **Ex. 11-33** (payment record).

285.　The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

286.　All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

287. That same day, All Star also pays a $750.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-34** (sham invoice), **Ex. 11-35** (payment record).

288. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

289. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

290. Three weeks later, on or about February 13, 2013, All Star pays a $750.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-36** (sham invoice), **Ex. 11-37** (payment record).

291. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

292. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

293. That same day, All Star also pays a $750.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-38** (sham invoice), **Ex. 11-39** (payment record).

294. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

295. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

296. The next week, on or about February 19, 2013, All Star also pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-40** (sham invoice), **Ex. 11-41** (payment record). The invoice refers to Ray Notaro ("Notaro"), a loan officer employed by Emery at the Emery Forest Hill Branch.

297. According to the sham invoice, Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

298.	All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

299.	Three days later, on or about February 22, 2013, All Star also pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-41** (sham invoice), **Ex. 11-42** (payment record).

300.	The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

301.	All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

302.	Only four days later, on or about February 26, 2013, All Star pays a $1,000.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-44** (sham invoice), **Ex. 11-45** (payment record).  The sham invoice references Emery's loan officer Notaro.

303.	The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are

transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

304. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

305. That same day, All Star also pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-46** (sham invoice), **Ex. 11-47** (payment record). The invoice refers to Michael Varlotta ("Varlotta"), a loan officer employed by Emery at the Emery Forest Hill Branch.

306. According to the sham invoice, Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

307. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

> **4. In the Second Quarter of 2013, Emery Receives and Accepts More Than $10,000 in Kickbacks for Loans Assigned and Referred from the Emery Forest Hill Branch.**

308. On or about April 3, 2013, All Star pays a $1,125.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-48** (sham invoice), **Ex. 11-49** (payment record). The

invoice refers to Michael Balzano ("Balzano"), a loan officer employed by Emery at the Emery Forest Hill Branch.

309. According to the sham invoice, Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

310. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

311. One week later, on or about April 10, 2013, All Star pays a $1,300.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-50** (sham invoice), **Ex. 11-51** (payment record).

312. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

313. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

314. That same day, All Star pays a $1,250.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-52** (sham invoice), **Ex. 11-53** (payment record).

315. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

316. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

317. Less than one week later, on or about April 16, 2013, All Star pays a $2,400.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-54** (sham invoice), **Ex. 11-55** (payment record).

318. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

319. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

320. A little more than a week  later, on or about April 23, 2013, All Star pays a $1,250.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-56** (sham invoice), **Ex. 11-57** (payment record).

321. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

322. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

323. Three weeks later, on or about May 15, 2013, All Star pays a $625.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-58** (sham invoice), **Ex. 11-59** (payment record).  The invoice refers to Scott Lewandowski ("Lewandowski"), a loan officer employed by Emery at the Emery Forest Hill Branch.

324. According to the sham invoice, Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

325. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

326.    Three week later, on or about June 7, 2013, All Star pays a $750.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-60** (sham invoice), **Ex. 11-61**, **Ex. 2-122, Ex. 2-123** (e-mail and payment record).

327.    The sham invoice refers to Emery's loan officer Balzano, and identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

328.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

329.    Two weeks later, on or about June 20, 2013, All Star pays a $625.00 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-63** (sham invoice), **Ex. 11-65**, **Ex. 2-122, Ex. 2-224** (e-mail and payment record).

330.    The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

331.  All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

332.  That same day, All Star pays a $1,562.50 kickback to Emery that is laundered by and through Azevedo. **Ex. 11-64** (sham invoice), **Ex. 11-65**, **Ex. 2-122**, **Ex. 2-124** (e-mail and payment record).  The invoice refers to Mark Kassouf ("Kassouf"), a loan officer employed by Emery at the Emery Forest Hill Branch.

333.  The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

334.  All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

    **5.    Emery Continues to Receive and Accept Kickbacks for Loans Assigned and Referred to All Star by the Emery Forest Hill Branch in the Third Quarter of 2013.**

335.  The next month, on or about July 23, 2013, All Star pays a $625.00 kickback to Emery that is laundered by and through Azevedo.  **Ex. 11-67** (sham invoice), **Ex. 11-68** (payment record).

336. The sham invoice identifies that Emery is receiving "live transfer" calls from Azevedo. Plaintiffs believe, and therefore aver, that the call center that Azevedo uses to source the "live transfer" calls is not located in Maryland such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state and being transferred to the Emery Forest Hill Branch, in a different state.

337. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Azevedo, in California.

338. One week later, on or about July 30, 2013, All Star pays a $500.00 kickback to Emery laundered by and through Raza Media, LLC dba MortgageLeads.org ("MortgageLeads"), a Nevada-based direct mail marketing and leads company. The July 2013 All Star employee expense sheet refers to Mike Bosworth ("Bosworth"), a loan officer employed by Emery at the Emery Forest Hill Branch. **Ex. 2-125** (expense sheet), **Ex. 2-126** (payment record).

339. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating at All Star's bank in Maryland, and Emery receiving the payment, by and through MortgageLeads, in Nevada.

340. Based on the continuing pattern of practice between All Star and Emery at the Emery Forest Hill Branch, Plaintiffs believe, and therefore aver, that All Star pays, and Emery receives, kickbacks in exchange for Emery's assignment and referral of loans in furtherance and performance of the Kickback Agreement, through additional loan

officers Emery employs at the Emery Forest Hill Branch, including but not limited to: Bret Springer, Adam Charney, Larry Schultz, and Todd Tabor.

341.  In addition to All Star paying and Emery, by and through the Emery Forest Hill Branch, receiving kickbacks in the forms identified above, Emery receives kickbacks in additional forms pursuant to the Kickback Agreement. *See, e.g.*, Oct. 2, 2012 e-mail re: All Star's agreement to pay for lunch for the Emery Forest Hill Branch due to and in exchange for their volume of referral of business, attached as **Exhibit 13**.

> ### 6. During the Entire Time Emery is Receiving Kickbacks for Loans Assigned and Referred from the Emery Forest Hill Branch, All Star and Emery Charge Emery Borrowers Fixed and Supracompetitive Prices for Title and Settlement Services in Performance of the Cartel Agreements.

342.  By January 2012, All Star and Emery conspire and agree to fix prices for title and settlement services associated with Emery loans referred to All Star by the Emery Forest Hill Branch at $1,200 including title insurance and an application signing fee for loans closed in licensed states, and $1,000 plus title insurance for loans closed in unlicensed states. In addition, All Star and Emery agree to charge a $150 application signing fee and a $450 attorney fee for loans closed in attorney states. *See* **Exhibit 4**, Jan. 3, 2012 Fee Spreadsheet.

343.  These fixed prices for title and settlement services are approximately $50 to $500 more than All Star has fixed with other Participating Lenders. This Kickback Overcharge, plus any Application Signing Surcharge and Attorney State Surcharge, are the minimum amount of actual damages incurred by Emery borrowers assigned and referred to All Star from the Emery Forest Hill Branch in performance of the Kickback and Cartel

Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme during this time period.

344.  Three months later, in April 2012, All Star and Emery update the prices fixed for title and settlement services associated with Emery loans referred to All Star by the Emery Forest Hill Branch to clarify that All Star charges $1,050 including insurance, plus a $450 attorney fee and $150 application signing fee loans closed in attorney states (DE, GA, MA, SC and VT) for a minimum fee charged of $1,650.  *See* **Exhibit 5**, Apr. 3, 2012 Fee Spreadsheet.  The spreadsheet also clarified that the minimum fee to be charged for loans closed in licensed states is $1,200 and the minimum fee to be charged for loans closed in unlicensed states is $900.

345.  These fixed prices are approximately $100 to $400 more than All Star has fixed with other Participating Lenders.  This Kickback Overcharge, along with any applicable Attorney State Surcharge and Application Signing Surcharge, is the minimum amount of actual damages incurred by Emery borrowers assigned and referred to All Star by the Emery Forest Hill Branch in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme during this time period.

346.  That same month, to fund the kickbacks being paid by All Star to Emery for loans brokered or originated by Emery loan officer Becker, All Star and Emery conspire and agree to increase the fixed prices for title and settlement services on those loans  to a minimum of $1,300 and a maximum of $1,800.  *See* July 24, 2012 e-mail, attached as **Exhibit 14**.  These fixed prices increase the Kickback Surcharge applicable to these loans by $100 and represents the minimum amount of actual damages incurred by the Emery

borrowers on these loans from the performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme during this period.

347. The Emery Forest Hill Branch and All Star agree to and perform the Kickback and Cartel Agreements through at least January 2014, and, on information and belief, longer. *See* Jan. 13, 2014 Title Fee Structure Chart, **Exhibit 10**. All Star and Emery charge Emery borrowers the fixed and minimum prices under the Kickback and Cartel Agreements on over 500 Emery loans assigned and referred from the Emery Forest Hill Branch and secured by real property in 45 states and the District of Columbia.

### C. Emery Participates in the All Star Scheme By and Through the Emery San Diego Branch.

348. Beginning in April 2012, Dan Rebello is a loan officer employed by Emery and operates an Emery branch located 555 West Beech Street in San Diego, California 92101 ("Emery San Diego Branch").

349. As described in more detail below, beginning in April 2012 and continuing through 2013, the Emery San Diego Branch receives and accepts over $250,000 in kickbacks from All Star pursuant to the Kickback Agreement.[3] During the same time period, Emery charges supracompetitive prices for title and settlement services in performance of the Cartel Agreements.

---

[3] All of the sham invoice and payment records associated with the kickbacks on Emery loans assigned and referred from the Emery San Diego Branch are collected in Exhibit 15 in chronological order. Page numbers have been added to each page of Exhibit 15 and are referenced in the same "Ex. No. - Page No." format.

1.    **By the Second Quarter of 2012, Emery Receives and Accepts More Than $22,000 for Loans Assigned and Referred by the Emery San Diego Branch.**

350.    Like it does for the Emery White Marsh and Forest Hill Branches, All Star pays kickbacks to the Emery San Diego Branch in exchange for the assignment and referral of Emery loans, refinances, and reverse mortgages to All Star for title and settlement services.

351.    On or about April 24, 2012, All Star pays a $2,266.82 kickback to Emery laundered by and through Lendanear. **Exhibit ("Ex.") 15-1** (sham invoice), **Ex. 15-5** (payment record).

352.    The sham invoice refers to Rebello, and identifies that Emery receives borrower credit data for borrowers located in all states except TX and NY. Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in California. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

353.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

354.    The next day, on or about April 25, 2012, All Star pays a $10,439.46 kickback to Emery laundered by and through Influence Direct. **Ex. 15-6** (sham invoice), **Ex. 15-7** (payment record).

355.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

356.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

357.    A month and a half later, on or about June 5, 2012, All Star pays a $1,885.58 kickback to Emery laundered by and through Lendanear.  **Ex. 15-8** (sham invoice), **Ex. 15-12** (payment record).

358.    The sham invoice identifies that Emery receives borrower credit data for borrowers located in twenty-two states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in California. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

359.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

360.    The next day, on or about June 6, 2012, All Star pays a $5,692.50 kickback to Emery laundered by and through Influence Direct.  **Ex. 15-13** (sham split invoice), **Ex. 15-14** (payment record).

361.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

362.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

363.    Later that month, on or about June 29, 2012, All Star pays a $2,277.00 kickback to Emery laundered by and through Influence Direct.  **Ex. 15-15** (sham split invoice), **Ex. 15-16** (payment record).

364.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

365.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization,

to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

> **2.** **In the Third Quarter of 2012, Emery Increases its Take by $10,000, Receiving and Accepting More Than $32,000 for Loans Assigned and Referred by the Emery San Diego Branch.**

366. Two weeks later, on or about July 11, 2012, All Star pays a $1,653.67 kickback to Emery laundered by and through Influence Direct. **Ex. 15-17** (sham split invoice), **Ex. 15-18** (payment record associated).

367. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

368. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

369. The next month, on or about August 1, 2012, All Star pays a $2,209.22 kickback to Emery laundered by and through Lendanear. **Ex. 15-19** (sham invoice), **Ex. 15-20** (payment record).

370. The sham invoice identifies that Emery receives borrower credit data for borrowers located in twenty-one states. Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in

California.  Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and to be placed in the interstate U. S. Mail in furtherance of the All Star Scheme.

371. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

372. The same day, All Star pays a $10,175.34 kickback to Emery laundered by and through Influence Direct.  **Ex. 15-21** (sham split invoice), **Ex. 15-22** (payment record).

373. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

374. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

375. The next month, on or about September 19, 2012, All Star pays a $3,040.56 kickback to Emery laundered by and through Lendanear.  **Ex. 15-23** (sham invoice), **Ex. 15-25** (payment record).

376. The sham invoice identifies that Emery receives borrower credit data for borrowers located in 27 states.  Plaintiffs believe and therefore aver that the borrower credit data

was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in California. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

377. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

378. The same day, All Star pays a $15,366.90 kickback to Emery laundered by and through Influence Direct. **Ex. 15-26** (sham split invoice), **Ex. 15-27** (payment record).

379. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

380. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

3.    **In the Fourth Quarter of 2012, Emery Continues to Receive More than $20,000 in Kickbacks for Loans Assigned and Referred by the Emery San Diego Branch.**

381.    Three months later, on or about November 9, 2012, All Star pays a $4,130.60 kickback to Emery laundered by and through Lendanear.  **Ex. 15-28** (sham invoice), **Ex. 15-30** (payment record).

382.    The sham invoice identifies that Emery receives borrower credit data for borrowers located in fourteen states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in California. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

383.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

384.    Three weeks later, All Star pays a $16,832.45 kickback to Emery laundered by and through Influence Direct.  **Ex. 15-31** (sham split invoice), **Ex. 15-32** (payment record).

385.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

386.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

### 4.   The Kickbacks Explode in 2013, with Emery Receiving More Than $166,000 in Kickbacks in the First Three Months Alone for Loans Assigned and Referred by the Emery San Diego Branch.

387.   Two months later, on or about January 2, 2013, All Star pays a $6,161.31 kickback to Emery laundered by and through Lendanear.  **Ex. 15-33** (sham invoice), **Ex. 15-35** (payment record).

388.   The sham invoice identifies that Emery receives borrower credit data for borrowers located in seventeen states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in California. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

389.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

390.   The next day, All Star pays a $29,924.35 kickback to Emery laundered by and through Influence Direct.  **Ex. 15-36** (sham split invoice), **Ex. 15-37** (payment record).

391.    The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

392.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

393.    Later that month, on or about January 25, 2013, All Star pays a $7,910.40 kickback to Emery laundered by and through Lendanear.  **Ex. 15-38** (sham invoice), **Ex. 15-41** (payment record).

394.    The sham invoice identifies that Emery receives borrower credit data for borrowers located in sixteen states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in California. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

395.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

396.   Three days later, on January 28, 2013, All Star pays a $38,419.20 kickback to Emery laundered by and through Influence Direct.  **Ex. 15-43** (sham split invoice), **Ex. 15-44** (payment record).

397.   The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

398.   All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

399.   The next month, on or about February 25, 2013, All Star pays a $3,897.46 kickback to Emery laundered by and through Lendanear.  **Ex. 15-45** (sham invoice), **Ex. 15-47** (payment record).

400.   The sham invoice identifies that Emery receives borrower credit data for borrowers located in eighteen states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in California. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

401.  All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

402.  The next day, on February 26, 2013, All Star pays a $41,600.79 kickback to Emery laundered by and through Influence Direct.  **Ex. 15-49** (sham split invoice), **Ex. 15-50** (payment record).

403.  The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

404.  All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

405.  One month later, on or about March 26, 2013, All Star pays a $6,276.90 kickback to Emery laundered by and through Lendanear.  **Ex. 15-51** (sham invoice), **Ex. 15-53** (payment record).

406.  The sham invoice identifies that Emery receives borrower credit data for borrowers located in nineteen states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in

California. Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

407. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

408. The same day, All Star pays a $32,416.20 kickback to Emery laundered by and through Influence Direct. **Ex. 15-55** (sham split invoice), **Ex. 15-56** (payment record).

409. The sham invoice identifies that Influence Direct prints and mails solicitations to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Emery solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Emery solicitations are placed in the mail in one state – Tennessee – and delivered to potential borrowers in other states.

410. All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Influence Direct, in Tennessee.

### 5. In the Second Quarter of 2013, Emery Continues to Receive and Accept Kickbacks for Loans Assigned and Referred by the Emery San Diego Branch.

411. Two months later, on or about May 21, 2013, All Star pays a $1,236.00 kickback to Emery laundered by and through Lendanear. **Ex. 15-57** (sham invoice), **Ex. 15-59** (payment record).

412.    The sham invoice identifies that Emery receives borrower credit data for borrowers located in fourteen states.  Plaintiffs believe and therefore aver that the borrower credit data was transmitted to Emery over interstate wires, originating with Lendanear in Tennessee and transmitted to, and received by Emery, in the Emery San Diego Branch in California.  Later, Emery causes the credit data to be merged into and on fraudulent borrower solicitations, described below, and placed in the interstate U.S. Mails in furtherance of the All Star Scheme.

413.    All Star chooses to transmit the kickback payment over interstate wires, with All Star emailing and/or faxing the kickback payment, in the form of a credit card authorization, to Emery over interstate wires, with the payment originating from All Star in Maryland, and Emery receiving the payment, by and through Lendanear, in Tennessee.

> **6.    During the Entire Time Emery is Receiving Hundreds of Thousands of Dollars in Kickbacks, All Star and Emery Charge Emery Borrowers Fixed and Supracompetitive Prices for Title and Settlement Services.**

414.    At the same time All Star begins paying kickbacks to the Emery San Diego Branch, All Star and Emery conspire to and agree to fix prices for title and settlement services associated with Emery loans referred to All Star by the Emery San Diego Branch at "$900 plus title" for all loans in non-attorney states and "$1,200 plus title" for loans closed in attorney states.  *See* Apr. 12, 2012 e-mail, attached as **Exhibit 16**.

415.    These fixed prices are $100 to $545 more than All Star charges on loans assigned and referred to All Star by other Participating Lenders.  This Kickback Overcharge represents the minimum amount of actual damages incurred by Emery borrowers assigned and referred to All Star from the Emery San Diego Branch in performance of the Kickback

and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

416. All Star and Emery charge Emery borrowers the fixed and minimum prices under the Kickback and Cartel Agreements on more than 240 Emery loans assigned and referred from the Emery San Diego Branch that are secured by real property in at least 25 states.

**D. Emery Participates in the All Star Scheme By and Through the Emery Towson Branch.**

417. Emery operates a branch located at 8600 Lasalle Road in Towson, Maryland 21286 ("Emery Towson Branch"). Emery employs a number of licensed mortgage loan originators and loan officers in the Emery Towson Branch, including Michael Belt, Mike Meeks, Robert Tacelosky, Howard Shipley, Anthony Miller, Martha Gatewood-Bell, John Bell, and Kimber Fog.

418. By April 2013, All Star and Emery conspire to and agree to fix prices for title and settlement services associated with Emery loans referred to All Star by the Emery Towson Branch at "$2,000 plus title insurance" and a $350 attorney fee where state law requires an attorney conduct the settlement or closing of a residential mortgage loan. *See* Apr. 18, 2013 Fee Sheet, attached as **Exhibit 17**.

419. These fixed prices are approximately $500 to $1,600 more than All Star charges for loans assigned and referred by other Participating Lenders. This Kickback Overcharge is the minimum amount of actual damages incurred by Emery borrowers assigned and referred to All Star from the Emery Towson Branch in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme during this time period.

420. Nine months later, All Star and Emery conspire to and agree to fix prices for title and settlement services associated with Emery loans referred to All Star by the Emery Towson Branch at "$1,400 plus title insurance" and increase the attorney closing fee to $450. *See* **Exhibit 10**, Jan. 13, 2014 Title Fee Structure Chart.

421. These fixed prices are approximately $300 to $725 more than All Star is charging for laons assigned and referred by other Participating Lenders. This Kickback Overcharge is the minimum amount of actual damages incurred by Emery borrowers assigned and referred to All Star from the Emery Towson Branch in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme during this time period.

422. Based on All Star's and Emery's continuing pattern of practice, Plaintiffs believe, and therefore aver, that during the time period All Star and Emery conspire to and fix prices for the title and settlement services associated with the loans assigned and referred to All Star by the Emery Towson Branch, Emery also receives and accepts kickbacks paid by All Star related to the Emery loans assigned and referred to All Star by the Emery Towson Branch.

423. The Emery Towson Branch charges the fixed and minimum prices under the Kickback and Cartel Agreements on over 30 Emery loans secured by real property in at least 15 states.

E.     **Emery Performs the Kickback and Cartel Agreements By and Through Additional Emery Branches.**

424. By 2011, All Star and Emery conspire and agree to fix prices on loans assigned and referred by Emery to All Star for title and settlement services from additional various Emery branches in several states. These Price Fixing and Minimum Fee Agreements

include agreements at the following branches: (a) the "1 West Chase Street" Branch managed by Emery loan officer Adam Ellis, *see* **Exhibit 18**, Sept. 12, 2011 Title Fee Structure List, and *see also* June 25, 2013 e-mail regarding fee agreement, attached as **Exhibit 19**; (b) the "Vale Road" Branch managed by Emery loan officer Angela Pobletts, *see* July 19, 2012 e-mail regarding fee agreement, attached as **Exhibit 20**; (c) the "New Jersey" Branch managed by Emery loan officer Brian Kelly, *see* **Exhibit 4**, Jan. 3, 2012 Fee Spreadsheet, and *see also* May 21, 2012 Fee Spreadsheet, attached as **Exhibit 21**; and **Exhibit 10**, Jan. 13, 2014 Title Fee Structure Chart; (d) the "Owings Court" Branch managed by Emery loan officer Adam Mandelberg, *see* **Exhibit 17**, Apr. 18, 2013 Fee Sheet; (e) the "Bel Air" Branch managed by Emery loan officer John Hauck, *see* **Exhibit 17**, Apr. 18, 2013 Fee Sheet; (f) the "Norcross (GA)" Branch managed by Emery loan officer Allan Wiggins, *see* **Exhibit 5**, Apr. 3, 2012 Fee Spreadsheet; (g) the "Cherokee (GA)" Branch managed by Emery loan officer Chad Bonadona, *see* **Exhibit 5**, Apr. 3, 2012 Fee Spreadsheet; and (h) the "Weatherstone (GA)" Branch managed by Emery loan officer Larry Lynn, *see* **Exhibit 10**, Jan. 13, 2014 Title Fee Structure Chart.

425. Collectively, these various branches assigned and referred more than 400 loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, affecting loan transactions secured by real property in 39 states.

426. Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe, and therefore aver, that All Star and Emery conspire to and fix prices for title and settlement services associated with loans assigned and referred to All Star by additional

known and unknown Emery Branches, branch managers, and loan officers in furtherance and performance of the Kickback and Cartel Agreements.

427. Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe, and therefore aver, that All Star pays, and Emery receives, kickbacks in exchange for Emery's assignment and referral of loans from additional known and unknown Emery branches, branch managers, and loan officers in furtherance and performance of the Kickback Agreement, including but not limited to Emery loan officers Steve Greathouse, Daryl Kalb, Chad Hiteshew, Mike Pfeil, Amy Pfeil, Mark Tonti, and Mark Thoner.

428. Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe and therefore aver that every loan that Emery assigned and referred to All Star from the period of January 1, 2011 through December 31, 2014 was subject to the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

429. Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe, and therefore aver, that All Star pays kickbacks to Emery laundered by and through other third party marketing companies in addition to those identified herein and in other forms in addition to those identified herein.

430. Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe, and therefore aver, that All Star and Emery use and cause to be used the U.S. mail and/or interstate wires to identify and solicit borrowers that are the currency of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

431.    As a result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, Emery borrowers, including Plaintiffs and alleged Class Members, are harmed because they are defrauded into being charged and paying higher and supracompetitive prices for title and settlement services than they would have been charged and paid without the Kickback and Cartel Agreements, are denied kickback-free title and settlement services, and are denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

432.    No title services were provided by Emery, or any Emery employee and/or agent, associated with the receipt and acceptance of any kickback.  The payment by All Star and the receipt and acceptance by Emery of the kickbacks was made solely for the assignment and referral of Emery borrowers to All Star.

**F.      Emery and All Star Form an Enterprise, and Emery Participates in the Conduct of the Affairs of the Enterprise Through a Pattern of Racketeering Activity.**

433.    By and through their participation in the All Star Scheme, Emery and All Star form an association in fact enterprise (the "Enterprise") with the purpose of defrauding borrowers into paying All Star higher and supracompetitive prices for title and settlement services associated with residential mortgage loans, refinances, and reverse mortgages, reducing competition in the market for title and settlement services, and funneling illegal kickbacks to Participating Lenders including Emery.

434.    Emery participates in the conduct of the Enterprise's affairs through performance of the Kickback and Cartel Agreements, and in performing and causing to be performed the predicate acts of mail and wire fraud.

435. At all relevant times, the Emery branch managers, mortgage brokers, and loan officers participating in the Enterprise's affairs through the pattern of racketeering activity alleged herein were acting within the scope of the business relationship and duties of their employment on behalf of Emery, and all activities were for the benefit of Emery.

436. Specifically, Emery, by and through its branch managers, mortgage brokers, and loan officers, directs, manages, and/or participates in directing or managing the Enterprise's affairs by, among other things, planning and directing the commission of the predicate acts of mail and wire fraud plead herein, including: (i) planning, directing, and controlling the mailing and content of borrower solicitations, including the inclusion of the fraudulent representations published in the borrower solicitations; (ii) identifying and directing which consumers are mailed borrower solicitations; (iii) identifying and directing the third party marketing companies used to launder the kickbacks including the third party marketing company's handling of the laundered illegal fee splits and kickbacks; and (iv) directing and controlling the creation of the sham invoice and payment records associated with the laundered kickbacks, including the means and methods of communicating the sham invoices and payment records; (v) and the content of those solicitations.

437. Emery, by and through its branch managers, mortgage brokers, and loan officers, also directs, manages, and/or participates in directing or managing the Enteprise's affairs by: (i) negotiating, directing, and controlling the amount and form in which the illegal fee splits and kickbacks are paid; (ii) negotiating, directing, and controlling the fixed prices charged borrowers for title and settlement services under the Cartel Agreements and

directing the charging of those amounts; and (iii) directing that borrowers' loans are assigned and referred to All Star.

438.    Emery derives benefits from the pattern of racketeering activity All Star and Emery conduct in furtherance of the Enterprise because the kickback payments received and accepted by Emery are used to produce and mail interstate borrower solicitations and obtain live transfer leads that generate residential mortgage loans, refinances, and reverse mortgages from which Emery earns fees, commissions, and other profits.

439.    Emery's participation in the Enterprise's affairs through the pattern of racketeering activity identified above, harmed the borrowers on loans assigned and referred to All Star by Emery, including Plaintiffs and alleged Class Members, because they are defrauded into being charged and paying higher and supracompetitive prices for title and settlement services than they would have been charged and paid without the Kickback and Cartel Agreements, are denied kickback-free title and settlement services, and are denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

## FACTUAL ALLEGATIONS RELATED TO
## THE INDIVIDUAL CLASS REPRESENTATIVES

440.    Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback and Cartel Agreements and are typical of all alleged Class Members' transactions.

**I.      The Solis Plaintiffs Obtain a Loan from Emery and are Victims of the All Star Scheme.**

441.    On or about March 2013, Plaintiffs Edwin and Shanna Solis obtain a residential mortgage loan from Emery through Dowling, a mortgage loan originator employed by Emery at the

Emery White Marsh Branch, in relation to the refinance of a loan secured by real property located at 46460 Midway Drive, Lexington Park, Maryland 20653.  The Solis Plaintiffs' Emery loan closes on or about March 28, 2013.  *See* Solis Plaintiffs' HUD-1, attached as **Exhibit 22**.

442.  The Solis Plaintiffs believe, and therefore aver, that Dowling assigns and refers the Solis Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for kickbacks All Star paid to Emery laundered by and through Best Rate and described in ¶¶ 184-186, thereby performing the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, depriving the Solis Plaintiffs of their choice of title and settlement service provider, and denying the Solis Plaintiffs kickback-free title and settlement services.

443.  All Star charges the Solis Plaintiffs $1,105.56 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  The price for title and settlement services All Star charges the Solis Plaintiffs are supracompetitive and are higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery perform in furtherance of the All Star Scheme.

444.  These title and settlement service fees include the Kickback Overcharge described in ¶¶ 229-231, which is the minimum amount of the Solis Plaintiffs' actual damages proximately caused by the All Star Scheme, the Cartel Agreements, and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

445. All Star disburses proceeds from the Solis Plaintiffs' Emery loan in payment of these title and settlement service charges as reflected on the Solis Plaintiffs' HUD-1. *See* **Exhibit 22**.

446. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, and Emery's performance of these agreements, the Solis Plaintiffs are harmed because they are: (i) charged and pay more for settlement services than they would have without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme; (ii) defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

447. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, the Solis Plaintiffs are charged and pay more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, and suffered actual damages in the amount of at least $55.56 and, on information and belief, additional amounts.

## II.     Plaintiff Gilbert Obtains a Loan from Emery and is a Victim of the All Star Scheme.

448.    On or about September, 2012, Plaintiff James Gilbert obtains a residential mortgage loan from Emery through James Ventura, a mortgage loan originator employed by Emery at the Emery White Marsh Branch, in relation to the refinance of residential real property located at 6758 Canterbury Road, Felton, Delaware 19943.  Plaintiff Gilbert's Emery loan closes on or about September 21, 2012.  *See* Plaintiff Gilbert's HUD-1, attached as **Exhibit 23**.

449.    Ventura assigns and refers the Plaintiff Gilbert's loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickbacks All Star pays to Emery laundered by and through Influence Direct and described in ¶¶ 125-127 or in the alternative ¶¶ 128-130 and is confirmed by the ledger communicated by Emery White Marsh Branch team manager McCrea to All Star and attached as **Exhibit 8**, thereby performing the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, depriving Plaintiff Gilbert of his choice of title and settlement service provider, and denying Plaintiff Gilbert kickback-free title and settlement services.

450.    All Star charges Plaintiff Gilbert $1,855.60 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  The price for title and settlement service fees All Star charges Plaintiff Gilbert are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery perform in furtherance of the All Star Scheme.

451.  These title and settlement service fees include the Kickback Overcharge described in ¶¶ 229-231 and the Attorney Fee Surcharge described in ¶ 228, which is the minimum amount of Plaintiff Gilbert's actual damages proximately caused by the All Star Scheme, Cartel and Price Fixing Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

452.  All Star disburses proceeds from the Plaintiff Gilbert's Emery loan in payment of these title and settlement service charges as reflected on Plaintiff Gilbert's HUD-1. *See* **Exhibit 23**.

453.  As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, Plaintiff Gilbert is harmed because he is: (i) charged and pays more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme; (ii) defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

454.  As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, Plaintiff Gilbert is charged and pays more for the title and settlement services than he would have paid without the Kickback and Cartel Agreements and the pattern of

racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, and suffered actual damages in the amount of at least $805.60 and, on information and belief, additional amounts.

### III. Plaintiff Markle Obtains a Loan from Emery and is a Victim of the All Star Scheme.

455. On or about April 2012, Plaintiff Jeffrey Markle obtains a residential mortgage loan from Emery through Dowling in relation to the refinance of a loan secured by residential real property located at 9210 Snyder Lane, Perry Hall, Maryland 21128. Plaintiff Markle's Emery loan closes on or about April 18, 2012.

456. Plaintiff Markle believes, and therefore avers, that Dowling assigns and refers Plaintiff Markle's loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickbacks All Star pays to Emery laundered by and through Influence Direct and/or Lendanear and described in ¶¶ 78-80, thereby performing the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, depriving Plaintiff Markle of his choice of title and settlement service provider, and denying Plaintiff Markle kickback-free title and settlement services.

457. All Star charges Plaintiff Markle for title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.

458. Plaintiff Markle believes, and therefore avers, that price for title and settlement service fees All Star charges Plaintiff Markle are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme

459. These title and settlement service fees include the Kickback Overcharge described in ¶¶ 226-227, which is the minimum amount of Plaintiff Markle's actual damages proximately caused by the All Star Scheme, Cartel and Price Fixing Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

460. All Star disburses proceeds from the Plaintiff Markle's Emery loan in payment of these title and settlement service charges.

461. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, Plaintiff Markle is harmed because he is: (i) charged and pays more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme; (ii) defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

462. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, Plaintiff Markle is charged and pays more for the title and settlement services than he would have without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme,

and suffered actual damages in the amount of between $50 to $890 and, on information and belief, additional amounts.

**IV.    Plaintiff Chaney Obtains a Loan from Emery and is a Victim of the All Star Scheme.**

463.    On or about March 2012, Plaintiff Marta Chaney obtains a residential mortgage loan from Emery through Alex Mavroulis, a loan officer employed by Emery at the Emery Forest Hill Branch, in relation to the refinance of a loan secured by residential real property located at 5501 Suffield Court, Columbia, Maryland 21044.  Plaintiff Chaney's Emery loan closes on or about March 23, 2012.  *See* Plaintiff Chaney's HUD-1, attached as **Exhibit 24**.

464.    Mavroulis assigns and referrs Plaintiff Chaney's loan to All Star in performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, depriving Plaintiff Chaney of her choice of title and settlement service provider, and denying Plaintiff Chaney kickback-free title and settlement services.

465.    All Star charges Plaintiff Chaney $1,050.00 in total title and settlement service fees thereby performing the Price Fixing and Minimum Fee Agreements.  The price for title and settlement service fees All Star charges Plaintiff Chaney are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

466.    These title and settlement service fees include the Kickback Overcharge described in ¶¶ 342-343, which is the minimum amount of Plaintiff Chaney's actual damages proximately caused by the All Star Scheme, Cartel and Price Fixing Agreements and the

pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

467.   All Star disburses proceeds from Plaintiff Chaney's Emery loan in payment of these title and settlement service charges as reflected on Plaintiff Chaney's HUD-1. *See* **Exhibit 24**.

468.   As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, Plaintiff Chaney is harmed because she is: (i) charged and paid more for settlement services than she would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme; (ii) defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of her choice of title and settlement service provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

469.   As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, Plaintiff Chaney is charged and pays more for the title and settlement services than she would have without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, and suffers actual damages in the amount of at least $50.00 and, on information and belief, additional amounts.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

470.    Essential to the All Star Scheme, Emery, as well as other members of the All Star Lender Cartel, and All Star undertook affirmative acts that fraudulently concealed the Kickback and Cartel Agreements, the resulting kickbacks and fixed prices, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

**I.      All Star and Emery Launder the Kickbacks Through Third Party Marketing Companies and Use Sham Invoice and Payment Records to Create a False Record and Conceal the Kickbacks from Borrowers, Auditors and Regulators.**

471.    As described in Paragraph 26 above, Emery and All Star choose to conceal the fact and payment of kickbacks by laundering kickbacks through third party marketing companies.

472.    As described in Paragraphs 26-31, Emery and All Star further choose to conceal the illegal kickbacks and Kickback Agreement through the creation of sham invoices and sham payment records.

473.    These sham invoices and payment records create an ongoing false record that conceals and prevents discovery of the fact that any "thing of value" is exchanged between Emery and All Star related to the assignment and referral of Emery loans, including Plaintiffs' loans, the actual payment and receipt and acceptance of illegal kickbacks, and Emery's coordinated business relationship with All Star.

**II.     Emery and All Star Make Fraudulent Representations in Marketing Materials to Defraud Borrowers into the All Star Scheme and to Conceal the Fixed and Supracompetitive Prices and Other Effects of the Kickback and Cartel Agreements.**

474.    To further conceal the Price Fixing Agreement, the Minimum Fee Agreement, the Kickback Agreement, and the resulting supracompetitive prices charged to borrowers for title and settlement services, Emery and All Star make false representations to borrowers in marketing materials.

475. In direct mail solicitations of borrowers, Emery represents that a borrower can "save 30-40% on your fees by choosing All Star" and that Emery has "chosen All Star as their partner to ensure that the closing process is smooth and convenient for our clients." *See, e.g.*, Emery White Marsh Branch team manager McCrea's June 2012 mailer, attached as **Exhibit 25**.

476. These representations are false because: (i) Emery does not recognize the designation of a "preferred" title company; (ii) a borrower cannot save any percentage of title fees with All Star, but instead is charged higher and supracompetitive fees under the Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme; (iii) the reason the Emery broker wants a borrower to use All Star is for Emery to obtain kickbacks and to perform its obligations under the Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, not because the borrower will receive lower fees; and (iv) any borrower responding to the direct mail solicitation does not "choose" All Star, but will be assigned and referred by Emery to All Star.

477. Plaintiffs believe, and therefore aver, that Emery makes similar false representations by other means, *e.g.*, in telemarketing and "live transfer" phone calls with borrowers.

**III.** **Emery and All Star Falsely Allocate Fees and Manipulate and Falsely State the APR to Further Conceal the Fixed and Supracompetitive Prices and Kickback and Cartel Agreements.**

478. The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus certain other lender fees, such as

origination fees, discount points and some closing costs, including some title and settlement service fees.  The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate.  Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

479.    The title and settlement service fees that are excluded in the APR calculation are defined by TILA.  12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that are excluded from the APR calculation.

480.    As a regular and continuing business practice, Emery and All Star allocate the charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR, thereby falsely minimizing the APR reported on borrowers' loan documents and required federal disclosures.

481.    For example, fees for "title examination", "abstract of title", and "title insurance" are excluded from the APR calculation – see, 12 C.F.R. § 1026.4(c)(7)(i) – while a settlement or closing fee, or an application signing fee, is a settlement service cost required to be included in the APR calculation.  See 12 C.F.R. § 1026.4(a)(1)(i).  By allocating the charges associated with conducting a settlement or closing with a borrower to the category of "title exam" or "abstract" the result is a false, and falsely minimized, APR.

482. All Star claims the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October 2015, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR. *See, e.g.*, June 6, 2011 e-mail, attached as **Exhibit 26**; September 24, 2015 e-mail, attached as **Exhibit 27**; October 6, 2015 e-mail, attached as **Exhibit 28**.

483. Emery participates in and ratifies this false allocation of fees. *See* **Exhibit 29**, Jan. 12, 2012 e-mail regarding Emery loan stating that settlement fees affect the APR. Based on this continuing pattern of practice, Plaintiffs believe, and therefore aver, that All Star and Emery engage in the false allocation and manipulation of the APR throughout the time period Emery is participating in the All Star Scheme.

484. For example, despite conducting a settlement or closing with each borrower, All Star and Emery choose not to allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR. Instead, All Star and Emery allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam", "Abstract", or "Title Insurance", which are excluded from the APR. *See* **Exhibit 29**; *see also* Plaintiffs' HUD-1s, **Exhibits 22** to **24**.

485. Emery's and All Star's choice to falsely allocate fees resulted in the fraudulent reporting of false APRs and the false, and falsely minimized, representation of the cost of the Emery loan to borrowers.

486. Emery's and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from borrowers the supracompetitive

pricing of title and settlement services resulting from the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme, and affirmatively prevented borrowers from discovering the supracompetitive nature of the pricing through comparison to Emery's and All Star's competitors.

487. As a regular business practice, All Star uses various software programs, including "TitleHound", to produce borrower loan documents, including documents reporting the APRs associated with a loan. All Star causes this software, including TitleHound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce Emery's loan documents to present to borrowers and on which Emery and All Star intended borrowers to rely. *See* **Exhibit 6**.

488. Emery's and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from borrowers the coordinated business relationship between Emery and All Star under the Kickback and Cartel Agreements, the supracompetitive and higher prices for title and settlement services resulting from the Kickback and Cartel Agreements, and affirmatively prevented borrowers from discovering their injuries resulting therefrom.

## IV. Emery and All Star Make False Representations on Borrowers' Loan Documents to Further Conceal the Kickbacks, Fixed and Supracompetitive Prices, and Other Facts Related to the Kickback and Cartel Agreements.

489. In addition to false representations in marketing communications to borrowers and the choice to misrepresent the actual APRs through the intentionally classifying some of All Star's charges as non-APR related charges, Emery and All Star choose to make false representations on borrowers' loan documents.

490. At all relevant times, federal law requires Emery, as lender or broker, to provide a "Good Faith" Estimate (the "GFE") to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b).

491. Block 4 of the "Good Faith" Estimate requires the lender to state only the charges for "title services and lender's title insurance."

492. As a regular pattern of practice, Emery falsely includes in Block 4 charges that are not title services and lender's title insurance, including the Kickback Overcharge, Attorney Fee Surcharge, Application Signing Surcharge, and other flat fee overcharges associated with the Price Fixing and Minimum Fee Agreements.

493. Emery's choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the charges and amounts associated with the surcharges and flat fixed fees; (ii) the fixed and supracompetitive nature of the charges; (iii) the illegal kickbacks; and (iv) the coordinated business relationship between Emery and All Star under the Kickback and Cartel Agreements.

494. In addition to the "Good Faith" Estimate, federal law, at all relevant times, required each borrower to receive a HUD-1 Settlement Statement (the "HUD-1") at the closing or settlement of a loan. The settlement agent produces the HUD-1, but federal regulations require the lender or broker to provide to the settlement agent all information appearing in the HUD-1 statement.

495. Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

496.   As a continuing pattern and regular business practice, Emery and All Star choose and cause the false allocation of fees described in ¶¶ 478-488 to repeat and appear on Emery borrowers' HUD-1 statements in Section 1100.

497.   As a continuing pattern and regular business practice, Emery omits and fails to describe anywhere on a borrower's HUD-1 statement the amount of the kickback received by Emery related to the borrower's loan or the fact that All Star has paid a kickback to Emery for the assignment and referral of the borrower's loan.  Emery is required to report the kickback on Line 801 or Line 808 of the HUD-1.

498.   As a continuing pattern of practice, Emery omits and fails to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any Kickback Overcharge, Attorney State Surcharge, Application Fee Surcharge, or other flat fees associated with the fixed prices under the Cartel Agreements.  Emery is required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

499.   As a continuing pattern of practice, Emery, and its loan officers, employees and/or agents, omit and fail to describe anywhere on a borrower's HUD-1 statement that Emery ultimately receives a portion of the charges listed in Section 1100 of the HUD-1, falsely stating instead that All Star retains all amounts paid by the borrower. This representation is false because All Star in fact splits a portion of the Section 1100 charges to kick back to Emery under the Kickback and Cartel Agreements.

500.   These false representations and omissions, presented to the Emery borrowers by All Star as Emery's agent at closing, fraudulently conceal: (i) the charges and amounts associated with the surcharges, overcharges, and flat fixed fees; (ii) the fixed and supracompetitive nature of the charges; (iii) the illegal kickbacks; and (iv) the coordinated business

relationship between Emery and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

501. Individually and collectively, Emery's and All Star's affirmative acts of concealment – the laundering of kickbacks through third party marketing companies, the related creation of sham invoice and payment records, the false marketing statements, the false allocation of fees and manipulation of the reported APR, and the misrepresentations and omissions on borrowers' GFEs, HUD-1s, and other loan documents – are outside the control of Emery borrowers, including Plaintiffs and Class Members, and are in the sole control of, and the result of choices by, Emery and All Star.

**V. Plaintiffs Exercise Reasonable Diligence Before, During, and After the Closing of Their Loans.**

502. As a result of the fraudulent concealments by Emery and All Star, Plaintiffs (and, upon information and belief, all alleged Class Members) had no actual notice before, at or after the closing of their loans of the illegal kickbacks, of the exchange of any "thing of value" between Emery and All Star, the Price Fixing and Minimum Fee Agreements or the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship between Emery and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

503. Plaintiffs exercised reasonable diligence before, during and after the closing of their loans.

A.  **The Solis Plaintiffs Exercise Reasonable Diligence.**

504.  The Solis Plaintiffs receive loan documents prepared by Emery in advance of their closing and review those loan documents.

505.  The Solis Plaintiffs believe, and therefore aver, that their pre-closing loan documents include a "Good Faith" Estimate prepared by Emery.

506.  Emery and All Star choose to omit from their "Good Faith" Estimate any description or statement of the coordinated business relationship between Emery and All Star and to include the fraudulent representations and omissions described in ¶¶ 490-493.  The Solis Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

507.  Emery and All Star choose to include in their pre-closing documents Emery and All Star's false allocation of fees and a false APR as described in ¶¶ 478-488.  The Solis Plaintiffs' belief as to the allocation of fees reflected on the "Good Faith" Estimate is supported by the allocation of fees on the Solis Plaintiffs' HUD-1, which is consistent with All Star and Emery's pattern of false allocation of fees and resulting false APR.  *See* Solis Plaintiffs' HUD-1, **Exhibit 22.**

508.  Emery and All Star make the false statements and omissions in the Solis Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from the Solis Plaintiffs, the coordinated business relationship between Emery and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickbacks related to the Solis Plaintiffs' loan, and the fixed and supracompetitive nature of prices charged the Solis Plaintiffs for title and settlement services.

509. As is reasonable under the circumstances, the Solis Plaintiffs believe these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Solis Plaintiffs did not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of the Solis Plaintiffs' loan for title and settlement services; or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between Emery and All Star and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

510. The Solis Plaintiffs act diligently during the closing or settlement of their loan. As a condition of funding their loan, Emery requires the Solis Plaintiffs to participate in a closing, and the Solis Plaintiffs attend and fully participate in the required closing and review all documents with All Star's representative.

511. At the closing of their loan, the Solis Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1. The Solis Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1.

512. Emery and All Star choose to omit from the documents the Solis Plaintiffs receive at closing, including their HUD-1, any description or statement of the coordinated business relationship between Emery and All Star under any of the Kickback or Cartel Agreements. *See* **Exhibit 22**.

513. Emery and All Star choose to omit from the documents the Solis Plaintiffs receive at closing, including their HUD-1, any description or statement of any payment, amount or

thing of value that was paid by All Star to Emery related to the Solis Plaintiffs' loan. *See* **Exhibit 22**.

514. Emery and All Star choose to include in the documents the Solis Plaintiffs receive at closing, including their HUD-1, the false allocation of fees as described in ¶¶ 478-488 and the resulting fraudulent representations and omissions as described in ¶¶ 494-498.

515. Emery and All Star make the fraudulent omissions and representations and false certifications in the Solis Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from the Solis Plaintiffs, the coordinated business relationship between Emery and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Solis Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and the Solis Plaintiffs' injuries and actual damages therefrom.

516. As is reasonable under the circumstances, the Solis Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Solis Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of the Solis Plaintiffs' loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Emery and All Star and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

517. The Solis Plaintiffs act diligently after their closing. On or about February 1, 2019, the Solis Plaintiffs receive a letter from undersigned counsel describing an investigation of

All Star and Emery. This is the Solis Plaintiffs' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

Within days, the Solis Plaintiffs contact and retain counsel. The Solis Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action.

**B.**     **Plaintiff Gilbert Exercises Reasonable Diligence.**

518.    Plaintiff Gilbert receives loan documents prepared by Emery in advance of his closing and reviews those loan documents.

519.    Plaintiff Gilbert believes, and therefore avers, that his pre-closing loan documents include a "Good Faith" Estimate prepared by Emery.

520.    Emery and All Star choose to omit from his "Good Faith" Estimate any description or statement of the coordinated business relationship between Emery and All Star and to include the fraudulent representations and omissions described in ¶¶ 490-493. Plaintiff Gilbert believes and therefore avers that his "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to his refinance.

521.    Emery and All Star choose to include in his pre-closing documents Emery's and All Star's false allocation of fees and a false APR as described in ¶¶ 478-488. Plaintiff Gilbert's belief is supported by the allocation of fees in his HUD-1, which is consistent with All Star and Emery's pattern of false allocation of fees and false statement of the APR. *See* **Exhibit 23**, Plaintiff Gilbert's HUD-1.

522.    Emery and All Star make the false statements and omissions in Plaintiff Gilbert's pre-closing loan documents for the purposes of concealing, and did so conceal from Plaintiff Gilbert, the coordinated business relationship between Emery and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to

Plaintiff Gilbert's loan, and the fixed and supracompetitive nature of prices charged Plaintiff Gilbert for title and settlement services.

523. As is reasonable under the circumstances, Plaintiff Gilbert believes these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Gilbert did not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Plaintiff Gilbert's loan for title and settlement services; or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between Emery and All Star and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

524. Plaintiff Gilbert acts diligently during the closing or settlement of his loan. As a condition of funding his loan, Emery requires Plaintiff Gilbert to participate in a closing, and he attends and fully participates in the required closing.

525. At the closing of his loan, Plaintiff Gilbert receives from All Star, or its agent, several documents, including a HUD-1. Plaintiff Gilbert reviews and signs all of the documents All Star presents at the closing, including the HUD-1.

526. Emery and All Star choose to omit from the documents Plaintiff Gilbert receives at closing, including his HUD-1, any description or statement of the coordinated business relationship between Emery and All Star under any of the Kickback or Cartel Agreements. *See* **Exhibit 23**, Plaintiff Gilbert's HUD-1.

527. Emery and All Star choose to omit from the documents Plaintiff Gilbert receives at closing, including his HUD-1, any description or statement of any payment, amount or

thing of value that was paid by All Star to Emery related to Plaintiff Gilbert's loan.  *See* **Exhibit 23**.

528.    Emery and All Star choose to include in the documents Plaintiff Gilbert receives at closing, including his HUD-1, the false allocation of fees as described in ¶¶ 478-488 and the resulting fraudulent representations and omissions as described in ¶¶ 494-498.

529.    Emery and All Star make the fraudulent omissions and representations and false certifications in Plaintiff Gilbert's loan closing documents for the purposes of concealing, and did so conceal from Plaintiff Gilbert, the coordinated business relationship between Emery and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Gilbert's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and Plaintiff Gilbert's injuries and actual damages therefrom.

530.    As is reasonable under the circumstances, Plaintiff Gilbert believes these closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Gilbert does not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Plaintiff Gilbert's loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Emery and All Star and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

531.    Plaintiff Gilbert acts diligently after his closing.  On or about February 1, 2019, Plaintiff Gilbert receives a letter from undersigned counsel describing an investigation of All Star

113

and Emery.  This is Plaintiff Gilbert's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

532.  Within days, Plaintiff Gilbert contacts and retains counsel.  Plaintiff Gilbert files this Complaint within months of becoming aware of facts giving rise to his causes of action.

### C.    Plaintiff Markle Exercises Reasonable Diligence.

533.  Plaintiff Markle receives loan documents prepared by Emery in advance of his closing and reviews those loan documents.

534.  Plaintiff Markle believes, and therefore avers, that his pre-closing loan documents include a "Good Faith" Estimate prepared by Emery.

535.  Emery and All Star choose to omit from his "Good Faith" Estimate any description or statement of the coordinated business relationship between Emery and All Star and to include the fraudulent representations and omissions described in ¶¶ 490-493. Plaintiff Markle believes and therefore avers that his "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to his refinance.

536.  Emery and All Star choose to include in his pre-closing documents Emery's and All Star's false allocation of fees and a false APR as described in ¶¶ 478-488.

537.  Emery and All Star make the false statements and omissions in Plaintiff Markle's pre-closing loan documents for the purposes of concealing, and did so conceal from Plaintiff Markle, the coordinated business relationship between Emery and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Markle's loan, and the fixed and supracompetitive nature of prices charged Plaintiff Markle for title and settlement services.

538. As is reasonable under the circumstances, Plaintiff Markle believes these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Markle did not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Plaintiff Markle's loan for title and settlement services, or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between Emery and All Star and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

539. Plaintiff Markle acts diligently during the closing or settlement of his loan. As a condition of funding his loan, Emery requires Plaintiff Markle to participate in a closing, and he attends and fully participates in the required closing.

540. At the closing of his loan, Plaintiff Markle receives from All Star, or its agent, several documents, including a HUD-1.

541. Plaintiff Markle believes, and therefore avers, that Emery and All Star choose to omit from the documents Plaintiff Markle receives at closing, including his HUD-1, any description or statement of the coordinated business relationship between Emery and All Star under any of the Kickback or Cartel Agreements.

542. Emery and All Star choose to omit from the documents Plaintiff Markle receives at closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to Emery related to Plaintiff Markle's loan.

543. Emery and All Star choose to include in the documents Plaintiff Markle receives at closing, including his HUD-1, the false allocation of fees as described in ¶¶ 478-488 and the resulting fraudulent representations and omissions as described in ¶¶ 494-498.

544. Emery and All Star make the fraudulent omissions and representations and false certifications in Plaintiff Markle's loan closing documents for the purposes of concealing, and did so conceal from Plaintiff Markle, the coordinated business relationship between Emery and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Markle's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and Plaintiff Markle's injuries and actual damages therefrom.

545. As is reasonable under the circumstances, Plaintiff Markle believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Markle does not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Plaintiff Markle's loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Emery and All Star and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

546. Plaintiff Markle acts diligently after his closing. On or about February 1, 2019, Plaintiff Markle receives a letter from undersigned counsel describing an investigation of All Star and Emery. This is Plaintiff Markle's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

547.   Within days, Plaintiff Markle contacts and retains counsel.  Plaintiff Markle files this Complaint within months of becoming aware of facts giving rise to his causes of action.

**D.    Plaintiff Chaney Exercises Reasonable Diligence.**

548.   Plaintiff Chaney receives loan documents prepared by Emery in advance of her closing and reviews those loan documents.

549.   Plaintiff Chaney believes, and therefore avers, that her pre-closing loan documents include a "Good Faith" Estimate prepared by Emery.

550.   Emery and All Star choose to omit from her "Good Faith" Estimate any description or statement of the coordinated business relationship between Emery and All Star and to include the fraudulent representations and omissions described in ¶¶ 490-493. Plaintiff Chaney believes and therefore avers that her "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to her refinance.

551.   Emery and All Star choose to include in her pre-closing documents Emery's and All Star's false allocation of fees and a false APR as described in ¶¶ 478-488.  Plaintiff Chaney's belief is supported by the allocation of fees appearing on the Chaney HUD-1, which is consistent with All Star's and Emery's pattern of false allocation of fees and resulting false APR.  *See* **Exhibit 24**, Plaintiff Chaney's HUD-1.

552.   Emery and All Star make the false statements and omissions in Plaintiff Chaney's pre-closing loan documents for the purposes of concealing, and did so conceal from Plaintiff Chaney, the coordinated business relationship between Emery and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Chaney's loan, and the fixed and supracompetitive nature of prices charged Plaintiff Chaney for title and settlement services.

553.   As is reasonable under the circumstances, Plaintiff Chaney believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Chaney did not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Plaintiff Chaney's loan for title and settlement services, or (iii) the prices she will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between Emery and All Star and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

554.   Plaintiff Chaney acts diligently during the closing or settlement of her loan.  As a condition of funding his loan, Emery requires Plaintiff Chaney to participate in a closing, and she attends and fully participates in the required closing.

555.   At the closing of her loan, Plaintiff Chaney receives from All Star, or its agent, several documents, including a HUD-1. Plaintiff Chaney reviews and signs all of the documents All Star presents at the closing, including the HUD-1.

556.   Emery and All Star choose to omit from the documents Plaintiff Chaney receives at closing, including her HUD-1, any description or statement of the coordinated business relationship between Emery and All Star under any of the Kickback or Cartel Agreements.  *See* **Exhibit 24**.

557.   Emery and All Star choose to omit from the documents Plaintiff Chaney receives at closing, including her HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to Emery related to Plaintiff Chaney's loan.  *See* **Exhibit 24**.

558. Emery and All Star choose to include in the documents Plaintiff Chaney receives at closing, including her HUD-1, the false allocation of fees as described in ¶¶ 478-488 and the resulting fraudulent representations and omissions as described in ¶¶ 494-498.

559. Emery and All Star make the fraudulent omissions and representations and false certifications in Plaintiff Chaney's loan closing documents for the purposes of concealing, and did so conceal from Plaintiff Chaney, the coordinated business relationship between Emery and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Chaney's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and Plaintiff Chaney's injuries and actual damages therefrom.

560. As is reasonable under the circumstances, Plaintiff Chaney believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Chaney does not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Plaintiff Chaney's loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Emery and All Star and the pattern of racketeering activity All Star and Emery conduct in furtherance of the All Star Scheme.

561. Plaintiff Chaney acts diligently after her closing. On or about February 1, 2019, Plaintiff Chaney receives a letter from undersigned counsel describing an investigation of All Star and Emery. This is Plaintiff Chaney's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

562. Within days, Plaintiff Chaney contacts and retains counsel. Plaintiff Chaney files this Complaint within months of becoming aware of facts giving rise to her causes of action.

## VI. **Accrual and Tolling of Limitations.**

563. The limitations period provided in 15 U.S.C. § 15(b), applicable to claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964**,** is subject to the injury discovery rule. *Med. Ctr. at Elizabeth Place v. Premier Health Partners*, 2016 U.S. Dist. LEXIS 192269, at *34-35 (S.D. Ohio Oct. 6, 2016) (antitrust tolling); *Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433 (6th Cir. 2005) (RICO tolling). Emery's affirmative acts precluded Emery borrowers, including Plaintiffs and Class Members, from discovering the fixed and supracompetitive nature of the prices charged for title and settlement services, and affirmatively prevented Emery borrowers, including Plaintiffs and Class Members, from discovering the fact of their injuries resulting therefrom.

564. As a result, Plaintiffs', and Class Members', claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 did not accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury. For the Solis Plaintiffs, Plaintiff Gilbert, Plaintiff Markle, and Plaintiff Chaney, this occurred on or about February 1, 2019.

565. In addition and in the alternative, as a result of Emery's and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during and after the closing of their loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of each Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein – for the Solis Plaintiffs, Plaintiff Gilbert, Plaintiff Markle, and Plaintiff Chaney, on or about February 1, 2019.

566.    Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback and Cartel Agreements and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to the tolling of applicable limitations period.

## COUNT I
## Violation of the Real Estate Settlement Procedures Act (RESPA),
## 12 U.S.C. § 2607(a)

567.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

568.    All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

569.    Emery, by and through its branch managers, mortgage brokers, loan officers, employees and/or agents, received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

570.    All loans assigned and referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by Emery and/or its affiliates, whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

571.    The payment and/or arranging of payment of kickbacks to Emery by All Star and Emery's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

572. Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Federal Rule of Civil Procedure 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Emery Federal Credit Union for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2011 and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2011 through December 31, 2014, was an employee, officer and/or agent of Emery Federal Credit Union or All Star Title, Inc.

> (the "RESPA Class").

573. There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

a. Whether there existed a referral agreement between Emery and All Star whereby Emery agreed to assign and refer loans, refinances, and reverse mortgages brokered or originated by Emery to All Star in return for kickbacks;

b. Whether Emery and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c. Whether the illegal kickbacks to Emery and its employees and/or agents violated RESPA;

d. Whether Emery and All Star used third party marketing companies to launder kickbacks related to Emery loans;

e. Whether Plaintiffs and RESPA Class Members were forced to pay more for said settlement services;

f. Whether Emery used sham and/or split invoices and sham payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g. Whether Emery disclosed or described to any borrower its coordinated business relationships with All Star or the fact that

a thing of value had been exchanged between Emery and All Star related to any borrower's loan;

h.  Whether Emery disclosed or described on any borrower's "Good Faith" Estimate, HUD-1, or other loan document Emery's coordinated business relationships with All Star or the fact that a thing of value had been exchanged between Emery and All Star related to any borrower's loan;

i.  Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

j.  Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

k.  Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

574.  These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

575.  Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

576.  Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The interests of Plaintiffs and all other members of the RESPA Class are identical.

577.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in this Court and other U.S. District Courts in similar litigation, and will adequately represent the RESPA Class's interests.

578.  The RESPA Class consists of borrowers on more than 1,700 loans, and thus are so numerous that joinder of all members is impracticable.

579.   Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Emery.

580.   This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

581.   Most members of the RESPA Class are unaware of their rights to prosecute a claim against Emery.

582.   No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Federal Rule of Civil Procedure 23(c).

## COUNT II
## Violation of the Sherman Act,
## 15 U.S.C. § 1

583.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

584.   All Star and Emery conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1.

585.   As a direct and proximate result of the Cartel Agreements between Emery and All Star, Plaintiffs and Class Members were charged and paid supracompetitive prices for title and settlement services and were charged and paid more for title and settlement services than they otherwise would have without the Cartel Agreements.

586.    As a direct and proximate result of the Cartel Agreements between Emery and All Star, Plaintiffs and Class Members were injured and suffered actual damages in the amount of between approximately $50 to $1,600, which is the Kickback Overcharge resulting from the Price Fixing and Minimum Fee Agreements between Emery and All Star.

587.    In addition, and in the alternative, as a direct and proximate result of the Cartel Agreements between Emery and All Star, Plaintiffs and Class Members were injured and suffered actual damages in the amount of applicable Kickback Overcharge, Attorney State Surcharge, Unlicensed State Surcharge, and/or Application Signing Surcharge resulting from the Price Fixing and Minimum Fee Agreements between Emery and All Star.

588.    Plaintiffs allege claims pursuant to Federal Rule of Civil Procedure 23 for violations of 15 U.S.C. § 1 ("Antitrust Class"), with the alleged Antitrust Class defined as:

> All individuals in the United States who were borrowers on a loan originated or brokered by Emery Federal Credit Union for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2011 and December 31, 2014.  Exempted from this class is any person who, during the period of January 1, 2011 through December 31, 2014, was an employee, officer and/or agent of Emery Federal Credit Union or All Star Title, Inc.

589.    The Antitrust Class consists of borrowers on more than 1,700 loans, and thus are so numerous that joinder of all members is impracticable.

590.    There are questions of law and fact common to the claims of each and all members of the Antitrust Class.  These common questions include, but are not limited to:

> a.  Whether Emery and its employees and/or agents violated the Sherman Act by conspiring to and fixing the title and settlement services fees charged to and paid by Plaintiffs and Antitrust Class Members;

125

b. Whether Emery and its employees and/or agents violated the Sherman Act by conspiring to and agreeing to supporting the Price Fixing and Minimum Fee Agreements through a concerted refusal to deal with non-cartel title and settlement service companies on all loans generated by Emery by the Kickback Agreement;

c. Whether the prices charged borrowers on loans brokered or originated by Emery pursuant to the Cartel Agreements were supracompetitive, and higher than prices that would have been charged without the Cartel Agreements;

d. Whether Emery made false representations to borrowers to actively conceal the Cartel Agreements and supracompetitive prices resulting therefrom;

e. Whether All Star falsely allocated fees to actively conceal the Cartel Agreements and the supracompetitive prices charged borrowers on loans brokered or originated by Emery in performance of those agreements;

f. Whether Emery made false representations on borrowers' GFEs, HUD-1s, and other loan documents to actively conceal the Cartel Agreements and the supracompetitive prices charged borrowers on loans brokered or originated by Emery in performance of those agreements;

g. Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the Cartel Agreements, the supracompetitive prices charged for title and settlement services, and their injuries and actual damages therefrom, until contacted by counsel;

h. Whether Plaintiffs and the Antitrust Class are entitled to treble damages under the Sherman Act; and

i. Whether Plaintiffs and the Antitrust Class are entitled to attorneys' fees and expenses under the Sherman Act.

591. These common issues of law and fact predominate over any question affecting only individual Antitrust Class Members.

592.    Plaintiffs' transactions and claims are typical of the claims or defenses of the respective Antitrust Class Members, and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 15(a).

593.    Plaintiffs will fairly and adequately protect the interests of the Antitrust Class. The interests of the named Plaintiff and all other members of the Antitrust Class are identical.

594.    Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, including in this Court, and will adequately represent the Antitrust Class's interests.

595.    Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Emery.

596.    This action entails questions of law and fact common to Antitrust Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

597.    Most members of the Antitrust Class are unaware of their rights to prosecute a claim against Emery.

598.    No member of the Antitrust Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Federal Rule of Civil Procedure 23(c).

**COUNT III**
**Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO),**
**18 U.S.C. § 1962**

599.  Plaintiffs incorporate the above stated paragraphs as if restated herein.

600.  Emery is a "person" as defined under 18 U.S.C. § 1961(3).

601.  By and through their participation in the All Star Scheme, Emery and the All Star constitute the Enterprise for the purposes of 18 U.S.C. § 1962(c).  For a continuous period of at least four years, Emery and All Star associate and commit the predicate acts of mail and wire fraud, which are separate and in addition to their legitimate mortgage and settlement services operations, for the common purpose of defrauding borrowers into paying higher and supracompetitive prices for title and settlement services and funneling of illegal kickbacks to Emery.

602.  The activities of the Enterprise affect interstate commerce across more than 40 states.

603.  Emery agreed to and did conduct and/or participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity and for the unlawful purpose of defrauding borrowers into paying fixed and supracompetitive prices for title and settlement services related residential mortgage, refinances, and reverse mortgages brokered or originated by Emery, and to thereby deprive borrowers of their money and/or property.

604.  The repeated use of the interstate U.S. Mail and wires by Emery and All Star over a period of approximately three years and involving over 1,700 borrowers in furtherance of the All Star Scheme and the Enterprise as pled herein, constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

605.  Emery has directly and indirectly conducted and participated in the conduct of the Enterprise's affairs, which affected interstate commerce in more than 40 states, through the pattern of racketeering activity pled herein, in violation of 18 U.S.C. § 1962(c).

128

606. Emery derives benefits from the pattern of racketeering activity All Star and Emery conduct in furtherance of the Enterprise.

607. As a direct and proximate result of Emery's participation in the All Star Scheme and the Enterprise through the pattern of racketeering activity pled herein, Plaintiffs and Class Members were injured and suffered actual damages in the amount of between approximately $50-1,600.

608. Plaintiffs allege claims pursuant to Federal Rule of Civil Procedure 23 for violations of 18 U.S.C. § 1962(c) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a loan originated or brokered by Emery Federal Credit Union for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2011 and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2011 through December 31, 2014, was an employee, officer and/or agent of Emery Federal Credit Union or All Star Title, Inc.

609. The RICO Class consists of borrowers on more than 1,700 loans, and thus are so numerous that joinder of all members is impracticable.

610. There are questions of law and fact common to the claims of each and all members of the RICO Class. These common questions include, but are not limited to:

> a. Whether Emery and its employees and/or agents violated RICO by defrauding borrowers, including Plaintiffs and RICO Class Members, into paying supracompetitive prices for title and settlement services and funding the kickbacks All Star is paying Emery;
>
> b. Whether Emery and All Star by and through their conduct formed an enterprise, associated in fact for a common purpose over a continuous time;
>
> c. Whether the activities of the Enterprise affected interstate commerce;

    d. Whether one purpose of the Enterprise was to deprive borrowers of money or property;

    e. Whether Emery and All Star used the interstate U.S. Mail in furtherance of the All Star Scheme and the Enterprise;

    f. Whether Emery and All Star used interstate wires in furtherance of the All Star Scheme and the Enterprise;

    g. Whether the use of interstate U.S. mail and wires pled herein constitutes a pattern of racketeering activity;

    h. Whether Emery conducted or participated in the Enterprise through a pattern of racketeering activity;

    i. Whether Emery fraudulently concealed the All Star Scheme, the supracompetitive prices, and the Enterprise;

    j. Whether Plaintiffs' and RICO Class members knew or should have known of their injuries resulting from Emery's violation of 18 U.S.C. § 1962(c);

    k. Whether Emery's and All Star's fraudulent concealments prevented Plaintiffs and RICO Class members from discovering their injuries proximately caused by Emery's conduct and/or participation in the conduct of the Enterprise's affairs through a pattern of racketeering activity;

    l. Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. § 1964(c); and

    m. Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c).

611. These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

612. Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RICO Class Members, and are subject to the same statutory measure of damages set forth in 18 U.S.C. § 1964(c).

613. Plaintiffs will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiffs and all other members of the RICO Class are identical.

614. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, including in this Court, and will adequately represent the RICO Class's interests.

615. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Emery.

616. This action entails questions of law and fact common to RICO Class members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

617. Most members of the RICO Class are unaware of their rights to prosecute a claim against Emery.

618. No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Federal Rule of Civil Procedure 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

    a. This Court to certify the RESPA, Antitrust, and RICO Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

    b. Judgment for Plaintiffs and RESPA Class Members against Emery Federal Credit Union and award Plaintiffs and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title

insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c.   Judgment for Plaintiffs and Antitrust Class Members against Emery Federal Credit Union and award Plaintiffs and Antitrust Class Members damages in the amount equal to three times the actual damages caused by the Cartel Agreements pursuant to 15 U.S.C. § 15(a);

d.   Judgment for Plaintiffs and RICO Class Members against Emery Federal Credit Union and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by the Enterprise pursuant to 18 U.S.C. § 1964(c);

e.   Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a), and 18 U.S.C. § 1964(c); and

f.   For such other and further relief as this Court deems proper.

Respectfully submitted,


*/s/ Gregory M. Utter*
Gregory M. Utter (0032528)
Melissa S. Matthews (0093352)
Keating Muething & Klekamp, PLL
1 East Fourth Street, Suite 1400
Cincinnati, OH 45202
Phone: (513) 579-6540
Fax: (513) 579-6457
gmutter@kmklaw.com
mmatthews@kmklaw.com
*Co-Counsel for Plaintiffs and Class Members*


*/s/ Timothy F. Maloney*
Timothy F. Maloney (*Pro Hac Vice pending*)
Veronica B. Nannis (*Pro Hac Vice pending*)
Megan Benevento (*Pro Hac Vice pending*)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Phone: (301) 220-2200
Fax: (301) 220-1214
tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiffs and Class Members*

/s/ *Michael Paul Smith*
Michael Paul Smith (*Pro Hac Vice pending*)
Melissa L. English (*Pro Hac Vice pending*)
Sarah A. Zadrozny (*Pro Hac Vice pending*)
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
Phone: (410) 821-0070
Fax: (410) 821-0071
mpsmith@sgs-law.com
menglish@sgs-law.com
szadrozny@sgs-law.com
*Counsel for Plaintiffs and Class Members*

## **PRAYER FOR JURY TRIAL**

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action Complaint.


Respectfully submitted,


/s/ Gregory M. Utter
Gregory M. Utter (0032528)
Melissa S. Matthews (0093352)
Keating Muething & Klekamp, PLL
1 East Fourth Street, Suite 1400
Cincinnati, OH  45202
Phone:  (513) 579-6540
Fax:  (513) 579-6457
gmutter@kmklaw.com
mmatthews@kmklaw.com
*Co-Counsel for Plaintiffs and Class Members*


/s/ Timothy F. Maloney
Timothy F. Maloney (*Pro Hac Vice pending*)
Veronica B. Nannis (*Pro Hac Vice pending*)
Megan Benevento (*Pro Hac Vice pending*)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
Phone:  (301) 220-2200
Fax:     (301) 220-1214
tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiffs and Class Members*

/s/ Michael Paul Smith
Michael Paul Smith (*Pro Hac Vice pending*)
Melissa L. English (*Pro Hac Vice pending*)
Sarah A. Zadrozny (*Pro Hac Vice pending*)
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD  21204
Phone:  (410) 821-0070
Fax:  (410) 821-0071
mpsmith@sgs-law.com
menglish@sgs-law.com
szadrozny@sgs-law.com
*Counsel for Plaintiffs and Class Members*

9203472.1