## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**EDWIN AND SHANNA
SOLIS, et al.,**

    **Plaintiffs,**      **Case No. 1:19-cv-387**
               **JUDGE DOUGLAS R. COLE**

  **v.**

**EMERY FEDERAL
CREDIT UNION,**

   **Defendant.**

## <u>OPINION AND ORDER</u>

This cause comes before the Court on Emery Federal Credit Union's ("Emery" or "Defendant") Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 20). For the following reasons, the Court **GRANTS** Emery's Motion (Doc. 20) and **DISMISSES** the Amended Complaint (Doc. 17) **WITHOUT PREJUDICE**.

## BACKGROUND

According to the Plaintiffs, this case is about lies and deceit.[1] The Plaintiffs, a group including Edwin and Shanna Solis (the "Solises"), James Gilbert ("Gilbert"), Jeffrey Markle ("Markle"), and Marta Chaney ("Chaney"), accuse Emery, a mortgage loan brokerage bank, of scheming with All Star Title, Inc. ("All Star"), a title and settlement services company, to fraudulently fix the prices for All Star's title and settlement services at supracompetitive (i.e., above market) rates. This in turn harmed Plaintiffs, each of whom financed through Emery, and thus used All Star.

---

[1] For the purposes of this Motion, the Court accepts as true the following facts, which are taken from Plaintiffs' Amended Complaint filed on August 19, 2019. (*See* Doc. 17).

Plaintiffs further allege that All Star shared its ill-gotten gains with Emery though a kickback scheme. (*See* Am. Compl., Doc. 17, ¶¶ 1–5, #548–49). Plaintiffs refer to this plan of exclusive dealing and supracompetitive pricing, accompanied by kickbacks from All Star to Emery, as the "All Star Scheme." (*Id.* at ¶ 2, #548). They say it dates back to 2008, when All Star created the All Star Scheme with lenders and their branch managers, mortgage brokers, loan officers, and other employees (collectively, the "Participating Lenders") "to charge borrowers higher prices for title and settlement services and to defraud borrowers of their money through the use of U.S. Mail and interstate wires." (*Id.* at ¶ 18, #551).

Interestingly, though, while the Amended Complaint raises the specter of multiple different lenders joining the All Star Scheme, that never actually materializes in the allegations. Rather, the Amended Complaint includes (and identifies) only one lender who allegedly participated in that "scheme"—Emery. According to the Amended Complaint, Emery enters the equation in 2011, when it "agrees to accept and receive kickbacks paid by All Star" in exchange for Emery referring and assigning loans to All Star for title and settlement services. (*Id.* at ¶ 54, #559). Emery and All Star concealed these kickbacks by "laundering" them through third-party-marketing companies, "creating sham invoice and payment records," "making fraudulent misrepresentations in marketing materials," "falsely allocating title and settlement fees[,]" "manipulating the APR associated with Emery loans," and "making false and fraudulent representations and omissions in Emery borrowers' loan documents." (*Id.* at ¶ 7, #549).

Adding to the ominous overtones of their Amended Complaint, Plaintiffs claim that Emery participated in the "All Star Scheme" through joining the "Lender Cartel." (*See id.* at ¶ 4, #548). But once again, while the Amended Complaint suggests that the "Cartel" involves "various residential mortgage lenders" who entered into price-fixing agreements designed to charge borrowers a fixed price for title and settlement services on loans assigned and referred to All Star under the kickback agreement, (*see id.*), the only participants it actually alleges engaged in the Scheme are various different branch locations of Emery itself. Specifically, Plaintiffs claim Emery participated in this Scheme and Cartel at its White Marsh, Forest Hill, San Diego, and Townson branches, among several others, through approximately 2013, allegedly accepting thousands of dollars in kickbacks along the way. (*See id.* at ¶¶ 59–272, #559–605 (White Marsh); *id.* at ¶¶ 283–430, #608–43 (Forest Hill); *id.* at ¶¶ 437–530, #645–66 (San Diego); *id.* at ¶¶ 534–40, #666–68 (Townson); *id.* at ¶ 541, #668–69 (Others)).

Aside from the "Scheme" and "Cartel," Plaintiffs further allege that Emery and All Star formed an "association in fact enterprise" (the "Enterprise"). (*Id.* at ¶ 550, #671). They created this Enterprise to "defraud[] borrowers into paying All Star higher and supracompetitive prices[,]" to "reduc[e] competition in the market for title and settlement services," and "funnel[] illegal kickbacks to Participating Lenders including Emery." (*Id.*). Emery participated in the Enterprise by performing the kickback and cartel agreements and by performing predicate acts of mail and wire fraud. (*Id.* at ¶ 551). These predicate acts included "planning, directing, and

controlling the mailing and content of borrower solicitations," including the fraudulent representations that were contained therein, "identifying and directing which consumers are mailed borrower solicitations," "identifying and directing" the third-party-marketing companies "used to launder the kickbacks[,]" and "directing and controlling the creation of sham invoices and payment records" to hide the kickbacks. (*Id.* at ¶ 553, #671–72).

Plaintiffs allege they all fell victim to the All Star Scheme when they obtained a residential mortgage loan through Emery. Specifically, Plaintiffs allege they were harmed in various, but closely related, ways: (1) they were charged and paid more for title and settlement services than they would have without the illegal conduct, as that illegal conduct resulted in them paying higher-than-market prices (due to the price fixing) and higher prices than All Star otherwise would have charged (as All Star needed to collect enough to cover the kickbacks in addition to its own profit); (2) they were defrauded into paying these supracompetitive prices; (3) they were stripped of their choice of title and settlement service providers, as well as their mortgage broker's impartial evaluation of All Star; and (4) they were deprived of kickback-free title and settlement services, along with the consumer benefits of fair competition among title and settlement service providers. (*See id.* at ¶ 563, #674–75 (Solises); *Id.* at ¶ 570, #676–77 (Gilbert); *Id.* at ¶ 578, #678–79 (Markle); *Id.* at ¶ 581, #680–81 (Chaney)).

Recognizing that statute of limitations issues were likely to arise, Plaintiffs also addressed in the Amended Complaint their delay in bringing suit. According to

4

Plaintiffs, they were reasonably diligent in trying to uncover Emery's fraud, but nothing seemed amiss from the face of the documents at closing. (*See, e.g.*, *id.* at ¶¶ 626–34, #690–92 (detailing how the Solises never noticed issues with the documents)). As a result, they did not discover the basis for their claim until attorneys contacted them around February 2019. (*See, e.g.*, *id.* at ¶ 635, #692 (explaining the Solises did not discover the claim until counsel sent them a letter describing the investigation)). Plaintiffs note that, after the attorney contact, they promptly moved forward with their claims. (*See e.g.*, *id.* (recounting how the Solises filed suit within months of being approached by the attorney)).

## PROCEDURAL HISTORY

Plaintiffs filed suit on May 24, 2019. (*See* Compl., Doc. 1, #1–475). They allege Emery violated (1) the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(a); (2) the Sherman Anti-Trust Act, 15 U.S.C. § 1; and (3) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. (*See* Compl. at ¶¶ 567–618, #121–32). Emery responded by moving to dismiss. That motion first argues that all of Plaintiffs' claims are time-barred. According to Emery, Plaintiffs failed to meet the statute of limitations (the longest of which is four years), and they failed to adequately plead fraudulent concealment as a basis for tolling. Second, Emery claims that the Plaintiffs failed to state a claim on the merits under any of their three theories of liability—RESPA, Sherman Act, or RICO. (*See* Emery's Mot. to Dismiss Pls.' Compl., Doc. 10, #493).

Plaintiffs countered the motion to dismiss by filing an amended complaint. (*See* Am. Compl., Doc. 17, #547–715). While the new pleading slightly modified some of the factual allegations, the basic causes of action against Emery remained unchanged. Not surprisingly, then, Emery again moved to dismiss Plaintiffs' Amended Complaint, largely on the same grounds. (*See* Emery's Mot. to Dismiss Pls.' Am. Compl. ("Mot. to Dismiss"), Doc. 20, #1072–1106). Now, though, in addition to maintaining Plaintiffs' claims are time-barred and that their Amended Complaint fails to state a claim, Emery also argues that Chaney lacks standing to bring any of the three claims, and that the Solises and Gilbert lack standing to bring the Sherman Act and RICO claims. (*See id.* at #1072). They do not make any standing argument as to Markle.

## LAW AND ANALYSIS

### A.    Standard Of Review.

The Court lacks subject-matter jurisdiction over a claim—and thus the claim is subject to dismissal—if the plaintiff fails to show that he has standing to bring it. Fed. R. Civ. P. 12(b)(1); *Ward v. Alt. Health Delivery Sys., Inc.*, 261 F.3d 624, 626 (6th Cir. 2001). The standard of review of a 12(b)(1) motion[2] to dismiss for lack of subject-matter jurisdiction depends on whether the defendant makes a factual or facial challenge to subject-matter jurisdiction. *See Gentek Bldg. Prods., Inc. v. Sherwin-*

---

[2] Emery fails to identify the section of Rule 12(b) under which it moves to dismiss Plaintiffs' Amended Complaint. In fact, Emery neglects to cite Rule 12 even once in its Motion to Dismiss. Nevertheless, because Emery challenges standing (which goes to subject-matter jurisdiction) and the sufficiency of Plaintiffs' allegations (which goes to Plaintiffs' failure to state a claim), the Court assumes Emery moves under Rule 12(b)(1), as to the former, and under Rule 12(b)(6), as to the latter.

*Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A factual attack challenges the jurisdictional facts set forth in the complaint, and thus forces the district court to "weigh the conflicting evidence to arrive at the factual predicate that subject-matter [jurisdiction] does or does not exist." *Id.* A facial attack on subject-matter jurisdiction, by contrast, does not challenge the factual allegations, but challenges the jurisdictional sufficiency of the complaint given those facts. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). It appears Emery's motion lodges the latter—a facial attack. When reviewing a facial attack, a district court takes the allegations in the complaint as true, similar to the approach employed in reviewing a Rule 12(b)(6) motion to dismiss. *Id.* If those allegations establish standing, jurisdiction exists (subject, of course, to later challenge if the allegations prove false).

Under Federal Rule of Civil Procedure 12(b)(6), meanwhile, the Court may dismiss a cause of action for "failure to state a claim upon which relief can be granted." Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). Therefore, much like the standard for a facial challenge under Rule 12(b)(1), the Court must construe the complaint in the light most favorable to the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). But a pleading must offer more than mere "labels and conclusions," because "'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Instead, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also White v. Coventry Health & Life Ins. Co.*, 680 F. App'x 410, 413 (6th Cir. 2017). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). To survive a Rule 12(b)(6) motion, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555.

Because this case involves allegations of fraudulent concealment, an additional pleading standard also comes into play. Specifically, when alleging fraud, a plaintiff must comply with Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Therefore, to establish fraudulent concealment that would toll the statute of limitations, a plaintiff must plausibly plead their allegations with particularity. *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 n.18 (6th Cir. 1988) (noting the Rule 9(b) standard applies to pleading fraudulent concealment).

## B. Emery's Motion To Dismiss Is Well Taken.

Emery's Motion to Dismiss raises several issues with Plaintiffs' Amended Complaint. Because two of those issues—standing and fraudulent concealment—cut across Plaintiffs' entire Amended Complaint, the Court focuses on those two arguments first. For the reasons that follow, on those issues, the Court finds that:

8

(1) Chaney lacks standing to pursue any of the three claims; (2) the Solises and Gilbert lack standing to pursue Sherman Act and RICO claims; and (3) no Plaintiff is entitled to equitable tolling by fraudulent concealment because they failed to plead sufficient facts establishing they diligently attempted to uncover Emery's supposed fraud. As a result, the Court DISMISSES the Amended Complaint, but does so WITHOUT PREJUDICE.

### 1. Certain Plaintiffs Lack Standing To Bring Their Claims.

Article III courts are courts of limited jurisdiction. *See* U.S. Const. art. III, § 2. Those limits come in three forms: constitutional, statutory, and jurisprudential. As a constitutional matter, the judicial power extends only to "cases" or "controversies." *Id.* Standing doctrine—at least the constitutional contours of that doctrine, which is the form of standing that Emery contests here—is one of several mechanisms designed to ensure that federal courts do not exceed the scope of their constitutionally-granted power. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the limitation of federal-court jurisdiction to actual cases or controversies."). And, because standing inquiries go to the Court's authority to hear a matter, where standing concerns are raised, the Court is required to address those concerns before considering the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998).

As a general matter, the "irreducible constitutional minimum" of standing consists of three elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Standing requires the plaintiff to have (1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant (3) that is likely to be redressed by a favorable judicial decision. *Id.* If a plaintiff lacks standing, the Court lacks the authority to decide the matter.

Here, Emery contends that certain Plaintiffs lack standing as to some or all of the claims. Specifically, they argue that Chaney lacks standing to bring any of the three claims asserted in the Amended Complaint—RESPA, Sherman Act, or RICO—because she suffered no injury in fact. (*See* Mot. to Dismiss at #1082–84). Because Chaney saved money on the title-related services (rather than over-paying, which is the alleged source of the harm here), she cannot establish she suffered an injury. (*See id.* at #1082). Emery further asserts that the Solises and Gilbert lack standing to bring Sherman Act and RICO claims. (*See id.* at #1084–85). Much like Emery's argument against Chaney, its basic argument is that the Solises and Gilbert lack standing to bring a Sherman Act claim because they did not actually pay the allegedly fixed prices that form the basis for their claims. (*See id.* at #1084). And, to the extent that the Solises' and Gilbert's RICO claim depends on the same price-fixing allegation, they lack standing for the same reason—they never paid the supposedly fixed price. (*See id.*). In fact, they paid less. (*See id.* at #1084–85).

Once standing concerns arise—whether raised by defendants, or *sua sponte* by the Court in meeting its obligation to ensure its own jurisdiction—Plaintiffs carry the burden to establish that standing requirements are met. *Spokeo, Inc.*, 136 S. Ct. at

1547. And, as further discussed below, this is a plaintiff-by-plaintiff inquiry. Each plaintiff must have standing for a court to consider that plaintiff's claims. *See Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 452 (6th Cir. 2017) ("The 'irreducible constitutional minimum' of standing is that for each claim, each plaintiff must allege an actual or imminent injury that is traceable to the defendant and redressable by the court.") (citing *Lujan*, 504 U.S. at 560–62 (1992)).

Plaintiffs did not carry their burden here. That may be because they did not even really try. Rather than seeking to demonstrate standing, they instead argue that, as "Emery does not challenge that the Solis and Gilbert Plaintiffs have standing to bring their RESPA claims and Plaintiff Markle has standing to bring all of his claims[,]" the Court has "supplemental jurisdiction over all Plaintiffs and all claims." (Pls.' Memo. in Opp'n to Def. Emery's Mot. to Dismiss, Doc. 22, #1121 (first citing 28 U.S.C. § 1367(a); then citing *Aldrich v. Univ. of Phx., Inc.*, 661 F. App'x 384, 389–90 (6th Cir. 2016))). That is, Plaintiffs argue that because some of them have standing as to some or all claims, the existence of that standing, coupled with supplemental jurisdiction under 28 U.S.C. § 1367, is enough to carry the day as to all Plaintiffs and all claims.

Wrong. To be sure, 28 U.S.C. § 1367 does allow a federal court to hear and decide claims that would otherwise fall outside the court's subject-matter jurisdiction if there is at least one claim that falls within such jurisdiction. *See* 28 U.S.C. § 1367(a). So, for example, if a suit includes one federal claim, a district court can also hear any state law claims "that are so related … that they form part of the same case

11

or controversy under Article III of the United States Constitution." *Id.*; *see also, e.g.*, *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 583 (6th Cir. 2011) (holding that § 1367 allowed the court to hear both federal and state law claims that stemmed from the same transaction because they "form[ed] part of the same case or controversy") (quoting 28 U.S.C. § 1367(a)). That works as a constitutional matter because Article III affords federal courts jurisdiction over "cases ... arising under ... the laws of the United States." *See* U.S. Const. art. III, § 2. The federal claim meets that limitation, and as a result, constitutional jurisdiction extends to the whole "case," which the Supreme Court has interpreted to include all claims arising out of a "common nucleus of operative facts." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). The language in 28 U.S.C. § 1367 thus merely provides statutory jurisdiction consistent with the scope of constitutional jurisdiction under *Gibbs*. And, as a result, federal question jurisdiction is not a claim-by-claim inquiry, but rather extends to the entirety of any "case" that includes a federal question claim.

The same is not true of standing. In the Supreme Court's words, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Rather, it is a claim-by-claim inquiry. That is because, unlike the question of "arising under," which merely turns on the source of the right at issue (i.e., whether the claim arises under state or federal law), standing goes to the very nature of justiciability itself. And, as the Supreme Court explained in *Flast v. Cohen*, not only are notions of justiciability embodied in the constitutional terms "case" or "controversy," but they also serve an

important limiting function in defining the judiciary's role in our tripartite form of government:

> Embodied in the words 'cases' and 'controversies' are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

392 U.S. 83, 94–95 (1968).

Standing is one aspect of the justiciability inquiry. *Id.* And, because justiciability is a fundamental limitation on the scope of the judicial power, the inquiry as to justiciability must necessarily be on a claim-by-claim basis. In other words, a party cannot combine a justiciable claim with a non-justiciable claim, and then argue that the court's power over the former likewise gives power over the latter. That is true even if the two claims meet the *Gibbs* common-nucleus-of-operative facts test. The Supreme Court explained that very point in *DaimlerChrylser Corp. v. Cuno*, 547 U.S. 332, 350–53 (2006). The Court also explained *why* it would be inappropriate to rely on *Gibbs* when dealing with justiciability issues such as standing or mootness:

> Plaintiffs' reading of *Gibbs* to allow standing as to one claim to suffice for all claims arising from the same "nucleus of operative fact" would have remarkable implications. The doctrines of mootness, ripeness, and political question all originate in Article III's "case" or "controversy" language, no less than standing does. Yet if *Gibbs*' "common nucleus" formulation announced a new definition of "case" or "controversy" for all Article III purposes, a federal court would be free to entertain moot or unripe claims, or claims presenting a political question, if they "derived from" the same "operative fact[s]" as another federal claim suffering from none of these defects. Plaintiffs' reading of *Gibbs*, therefore, would

13

amount to a significant revision of our precedent interpreting Article III. With federal courts thus deciding issues they would not otherwise be authorized to decide, the "tripartite allocation of power" that Article III is designed to maintain, would quickly erode; our emphasis on the standing requirement's role in maintaining this separation would be rendered hollow rhetoric.

*Id*. at 352–53 (quotations and citations omitted).

That forbidden approach is essentially the same argument that Plaintiffs press here. If anything, the current case may be worse. As to Gilbert and the Solises, Plaintiffs seek to use the standing on one claim (RESPA) to allow the Court to hear two others (Sherman Act and RICO) by those same parties—which was the very approach the Supreme Court rejected in *Cuno*. But as to Chaney, Plaintiffs are not seeking merely to couple a non-justiciable claim with a viable claim by the same party. Rather, they are asserting the right to add a party who has *no* justiciable claims, merely because a different party pressing related claims has standing. That doesn't work.

Aside from their standing-does-not-matter argument, Plaintiffs make no other arguments in support of standing. Accordingly, any such arguments are waived. *See In re Anheuser-Busch Beer Labeling Mktg. & Sales Practices Litig.*, 644 F. App'x 515, 529 (6th Cir. 2016) (noting that when a litigant fails to raise an argument in the district court, the litigant forfeits such argument); *see also Notredan, L.L.C. v. Old Republic Exch. Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013) (holding that failing to respond to an argument that a claim is subject to dismissal "amounts to a forfeiture of [that] claim"); *Bushong v. Del. City Sch. Dist.*, No. 2:19-cv-858, 2020 WL 419754, at *7 (S.D. Ohio Jan. 27, 2020) ("Defendants argue Plaintiff fails to allege an

independent constitutional violation. Plaintiff fails to respond to this argument, and as such, waives it.").

The Court therefore dismisses all of Chaney's claims and the Solises' and Gilbert's Sherman Act and RICO claims for lack of jurisdiction. Because this is a first dismissal, the Court grants the dismissal without prejudice to allow the Plaintiffs, if they can, to make the necessary showings to establish standing for each party. The Plaintiffs shall have twenty-eight days from the entry of this Order in which to do so.

### 2. Plaintiffs Failed To Adequately Plead Fraudulent Concealment To Toll The Statutes Of Limitations.

Emery does not dispute Markle's standing as to any of the three claims. Accordingly, even having dismissed Chaney (as to all claims) and the Solises and Gilbert (as to two of the three), the Court must still consider Emery's arguments as to the merits of the three claims. The Court need not proceed very far in that regard, though, due to another threshold issue that applies to each of the three claims—the statute of limitations.

The events alleged in the Amended Complaint occurred between approximately 2011 and 2013. (*See* Am. Compl. at #559 ("By 2011, Emery and All Star form an Association in Fact Enterprise and Emery Begins Participating in the All Star Scheme."); *see also id.* at ¶ 558, #673 (stating the last Plaintiffs' loan closing occurred on March 28, 2013)). And the longest statute of limitations for any of the three claims is four years. *See* 15 U.S.C. § 15b ("Any action to enforce any cause of action under [the Sherman Anti-Trust Act] shall be forever barred unless commenced within four years after the cause of action accrued."); *accord Rotella v. Wood*, 528 U.S.

15

549, 553 (2000) (stating the statute of limitations for a civil RICO claim is four years). Emery asserts, and Plaintiffs do not contest,[3] that the statute of limitations clock started ticking at closing, which is when Plaintiffs allege their injury occurred. (*See* Mot. to Dismiss at #1085–86). If that is the case, and the statute of limitations was triggered at the last closing on March 28, 2013, then the statute of limitations has long expired—absent tolling. Likely aware of this difficulty, Plaintiffs allege in their Amended Complaint, and argue in response to the Motion to Dismiss, that fraudulent concealment tolled the statute of limitations. (*See* Am. Compl. at ¶¶ 681–84, #701–02). If they have not sufficiently pled fraudulent concealment, though, all their claims are time-barred as a matter of law. Thus, the Court will start with fraudulent concealment.

Statutes of limitations matter. Among other things, they represent legislative choices regarding the time period during which a plaintiff is expected to discover and bring a certain type of claim. As a matter of separation of powers, if nothing else, courts must be respectful of those legislative determinations. But beyond that, statutes of limitations also make practical sense, and serve important purposes within a system of justice. As time passes, memories and evidence both fade. *See Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) ("Stale conflicts should be allowed to rest undisturbed after the passage of time has made

---

[3] Even though Plaintiffs state in their Amended Complaint that their Sherman Act and RICO claims did not accrue "until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury," which Plaintiffs claim is February 1, 2019, (Am. Compl. at ¶ 682, #701), Plaintiffs do not make this argument in their response to Emery's Motion to Dismiss. Because they did not make this argument, it is forfeited, *see In re Anheuser-Busch*, 644 F. App'x at 529, and the Court assumes their claims accrued at closing.

16

their origins obscure and the evidence uncertain."). By forcing plaintiffs to bring claims sooner, rather than later, statutes of limitations result in witnesses who are more reliable and evidence that is fresher. As a result, expected judicial error costs go down. It is no surprise, then, that the Supreme Court itself has emphasized that "[s]tatutes of limitations are not simply technicalities. On the contrary, they have long been respected as fundamental to a well-ordered judicial system." *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 487 (1980).

Typically, the limitations period begins running either at the time that an injury occurs, regardless of whether a plaintiff is aware of the injury, or at the time that a plaintiff "discovers" he has been injured—i.e., the "discovery rule"—which is when a plaintiff discovers, or reasonably could have discovered, that he has been injured. For both the RESPA and Sherman Act statutes of limitations, the date of injury is the trigger. *See Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 421 n.7 (6th Cir. 2009) (explaining the RESPA statute of limitations begins to run "from the date of the occurrence of the violation"); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (explaining that generally a Sherman Act cause of action begins to run when the defendant injures the plaintiff's business). For a civil RICO claim, on the other hand, the statute of limitations incorporates the discovery rule. *See Rotella*, 528 U.S. at 553–55 (deciding that the RICO statute of limitations begins to run when a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation).

While the finality that statutes of limitations provide is an important aspect of our judicial system, courts have nonetheless created certain equitable doctrines that can serve to extend the limitations period in certain circumstances. Particularly relevant here is the doctrine of fraudulent concealment. Basically, this doctrine recognizes that, where the defendant takes steps to "cover its tracks" and prevent a plaintiff from discovering the harm he has caused, the defendant should not be allowed to rely on the limitations period to escape liability for his conduct. *See Pinney Dock & Transp. Co.* 838 F.2d at 1465 (explaining how "the authorities are without conflict" supporting the doctrine that "where the ignorance of the fraud has been produced by affirmative acts of the guilty party in concealing the facts from the other, the statute will not bar relief provided suit is brought within proper time after the discovery of the fraud") (citing *Bailey v. Glover*, 88 U.S. 342, 347–48 (1874)).

As a general matter, then, if a plaintiff can establish grounds for fraudulent concealment, the limitations period is tolled.[4] *Id.* To take advantage of this doctrine, the plaintiff must show three elements: (1) the defendant actively concealed the

---

[4] The Sixth Circuit has yet to determine whether equitable tolling applies to RESPA claims, but it has noted that many district courts have already done so. *See Egerer*, 556 F.3d at 421 n.10 (listing cases that have held RESPA's statute of limitations is subject to equitable tolling). Several district courts in this Circuit have allowed equitable tolling. *See, e.g.*, *Palombaro v. Emery Fed. Credit Union*, No. 1:15-cv-792, 2017 WL 3437559, at *8–11 (S.D. Ohio Aug. 10, 2017) (analyzing the plaintiffs' equitable tolling claim without first deciding whether RESPA allows for equitable tolling); *Piccirilli v. Wells Fargo Bank, N.A.*, No. 2:11-cv-10264, 2012 WL 1094333, at *6 (E.D. Mich. Mar. 30, 2012) (assuming equitable tolling applies to RESPA). Therefore, for purposes of deciding this Motion, the Court also assumes that equitable tolling applies to RESPA. In any event, it may not matter much. As already noted, RESPA includes a discovery rule, under which the limitations period is not triggered until a plaintiff reasonably should have discovered the violation. So, where a defendant fraudulently conceals the harm, that may merely prevent the trigger for the RESPA claim, rather than tolling a period already started. Either way, though, the end result is the same— sufficient allegations of fraud can extend the last date on which a RESPA claim may be filed.

conduct constituting the cause of action; (2) this concealment prevented the plaintiff from discovering the cause of action within the limitations period; and (3) until discovery, the plaintiff exercised due diligence trying to learn about the cause of action. *Egerer*, 556 F.3d at 422.

The Court approaches fraudulent concealment issues at the dismissal stage with two, somewhat competing, frameworks in mind. First, federal law is clear that, as fraudulent concealment sounds in fraud, the heightened pleading standards of Rule 9(b) apply to a plaintiff seeking to rely on fraudulent concealment to toll a limitations period. *Dayco Corp.*, 523 F.2d at 394. Under Rule 9(b), to escape dismissal, a plaintiff must plead the circumstances giving rise to fraudulent concealment with particularity. Fed. R. Civ. P. 9(b). Conversely, however, the Sixth Circuit has also admonished that courts should be wary of dismissing complaints on fraudulent concealment grounds, as the plaintiff has not had the benefit of discovery. *See, e.g.*, *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 476 (6th Cir. 2013) ("*Lutz I*") ("When there is 'some question as to the depth and scope of [the plaintiffs'] investigation, [the plaintiffs] should be allowed to proceed forward.'") (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 448 (6th Cir. 2012)).

A key issue in the current case is due diligence—the third prong of the fraudulent concealment framework. Under this prong, Plaintiffs must ultimately prove that they acted in a reasonably diligent fashion in seeking to discover and pursue their claim. *See id.* at 475. But that does not necessarily require the Plaintiffs to show they did anything to pursue their claims. Rather, due diligence requires

action only once a plaintiff has sufficient notice of a potential injury. *See id.* ("The right to rely on fraudulent concealment never continues beyond the time that a plaintiff, by exercising reasonable diligence, should have discovered the facts at issue.") (quotation omitted); *see also Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982) (explaining that "[a]ctions such as would deceive a reasonably diligent plaintiff will toll the statute," but "plaintiffs who delay unreasonably in investigating circumstances that should put them on notice will be foreclosed from filing, once the statute has run"). In other words, the question is whether a reasonable person in the Plaintiffs' position, with the information available to the Plaintiffs, would have been on inquiry notice that they should be investigating a potential claim.

Often, the diligence that is "due" turns on the nature of the claim. Some types of harm are more readily hidden than others. For example, if a plaintiff relies on what a defendant has said about a particular topic, and has no practical way of assessing the truthfulness of the statement, then no action may be necessary. *See, e.g.*, *Lutz I*, 717 F.3d at 476 (deciding the plaintiff alleged sufficient facts to overcome a motion to dismiss contesting their diligence because a reasonably prudent person would have had no way to know, absent discovery, that the defendant fraudulently miscalculated the royalty payments and misrepresented those calculations to the plaintiff). At the same time, a plaintiff cannot stick his or her head in the sand and fail to take steps to discover their claims when the information is readily available to them. *See, e.g.*, *Campbell*, 676 F.2d at 1127 (upholding the district court's decision granting summary

judgment because the plaintiff had a copy of the contract and should have read the agreement and learned the terms were inconsistent with his expectations).

Here, the core allegation is that Plaintiffs paid an artificially high price for certain title services. At various points, the price is described as "supracompetitive" (i.e., above market), and at other points as a price higher than the price All Star otherwise would have charged (as All Star had to charge enough to pay the various "kickbacks" as well as its standard rate). (*Compare* Am. Compl. at ¶ 39, #555–56 (claiming the prices were "supracompetitive and higher than the prices that borrowers would otherwise be charged for title and settlement services in a competitive market and without the Cartel Agreements"), *with id.* at ¶ 281, #608 (alleging All Star and Emery fixed prices for title and settlement services associated with Emery loans that were "approximately $150 to $950 more than All Star has fixed with other Participating Lenders")). But, presumably, the two collapse in this sense— All Star operates in a competitive market, and thus its "normal" rates would presumably be "competitive" rates. So "supracompetitive" and "higher than All Star's normal rates" may simply be two different ways of saying roughly the same thing.

The allegations here—which claim above-market pricing—present a difficult issue from a fraudulent concealment standpoint, at least under current Sixth Circuit precedent. The claim of harm resulting from non-market rates is very similar to the claims at issue in *Lutz I*. There, the plaintiff-landowners claimed that Chesapeake had harmed them by underpaying royalties due according to their natural gas leases. *See Lutz I*, 717 F.3d at 462–63. The leases called for royalties based on market rates

for natural gas. *See id.* at 463. Thus, there, like here, the alleged harm was the divergence between the actual payment that occurred and the payment that would have been called for at market rates.

But *Lutz I*, at least when read in light of the recent follow-on decision in the same case in *Lutz v. Chesapeake Appalachia, L.L.C.*, --- F. App'x ----, No. 19-3315, 2020 WL 1651625 (6th Cir. Apr. 3, 2020) ("*Lutz II*"), creates some confusion regarding how fraudulent concealment works in that setting. In particular, a key issue would seem to be this: where the alleged harm is a divergence from market rates, a plaintiff could presumably detect that harm by comparing the rate charged (or, in *Lutz*, the rate paid) to the market rates, at least if that information is publicly available (e.g., through public pricing information, or by calling a competitor). If that is the case, does the due diligence prong of fraudulent concealment require a plaintiff to undertake that inquiry? And, if so, do pleading standards—especially Rule 9(b)'s heightened pleading standard—require a plaintiff to plead that he or she took such steps?

*Lutz I* seems to suggest "no," at least to the second question. In *Lutz I*, the court assumed the plaintiffs' factual allegations were true, including the claim that plaintiffs had "no practical way to independently determine the amount of royalty payments due[.]" *See Lutz I*, 717 F.3d at 475. The plaintiffs claimed that "a reasonably prudent person would have had no way of knowing about the fraud due to the inaccuracies of the reports." *Id.* at 476. The Sixth Circuit concluded that was enough to move forward on a fraudulent concealment theory at the motion to dismiss stage.

In short, *Lutz I* could be read as suggesting that, so long as a plaintiff is willing to allege that he or she had no way to detect the underpayment, and thus was forced to rely on the defendant's representation, that works.

But the Sixth Circuit's decision in *Lutz II* undercuts that reading of *Lutz I*. That is because, in *Lutz II*, the Sixth Circuit refused to give credit to the notion that a plaintiff could not detect the harm when that harm consisted of a failure to pay the promised market price. *See Lutz II*, 2020 WL 1651625, at *3–4. In further discovery during *Lutz*, the plaintiffs "admitted they neither compared the pay rate column to the publicly available market prices for natural gas, nor examined the column that reflected deductions for production costs[,]" despite having public information regarding gas prices available to them. *Id.* at *2, 3. Pointing to that failure, the court observed that "[a]ny dispute about the payment was thus discoverable … by seeking out public information easily accessible to them." *Id.* at *3. Accordingly, the plaintiffs failed to establish their diligence. *Id.* The court in *Lutz II* further observed that any other conclusion would undermine the statute of limitations itself, at least as to the claim for royalty payments. *Id.* at *4. "After all, a similarly idle lessor could always claim that she simply took a defendant at its word in computing royalties." *Id.*

At first glance, *Lutz I* and *Lutz II* seem difficult to square. To be sure, *Lutz II* involved the summary judgment stage. But, if the rule is that, in cases where fraud could be detected by simply comparing the payment at issue to the market price, a plaintiff must offer some explanation at summary judgment explaining his failure to make that comparison, then why at the motion to dismiss stage would a plaintiff not

23

be required to plausibly plead such allegations? After all, *Twombly* requires "plausibility" at the pleading stage as to each of the substantive elements of a claim. *See Twombly*, 550 U.S. at 570. Thus, the substantive requirements that exist at the summary judgment stage necessarily must inform the plausibility inquiry at the pleading stage. That is, if a plaintiff seeking to take advantage of fraudulent concealment tolling must show at summary judgment that he or she checked market prices (or otherwise took some other active step to satisfy due diligence in cases where the price divergence could easily be discovered by market research), then presumably *Twombly*—especially given Rule 9(b)—requires the plaintiff to plead some facts in that regard at the pleading stage.

As noted, *Lutz I* could be read as suggesting that is not so, but perhaps that is a misreading of *Lutz I*. After all, in *Lutz I* the Sixth Circuit highlighted the allegation in the complaint that "plaintiffs had no practical way to independently determine the amount of royalty payments due[.]" 717 F.3d at 475. That, of course, is not true if the royalty payments depend solely on the market price of natural gas—publicly available information. So perhaps the *Lutz I* court based its decision on a belief that the nature of the injury at issue was not simply a divergence between market-price and the price actually paid, but rather some other harder-to-detect type of mis-payment issue.

In any event, whatever difficulties may arise in attempting to reconcile the teachings of *Lutz I* and *Lutz II*, it seems readily apparent that, in the end, to take advantage of fraudulent concealment, the Plaintiffs here will be required to prove

that they took at least some steps to ascertain whether or not they were in fact receiving the promised below-market pricing. *See Lutz II*, 2020 WL 1651625, at *3–4. Accordingly, given Rule 9(b) and *Twombly*, this Court determines that they must allege facts showing that they have a plausible likelihood of meeting that standard to move beyond the motion to dismiss stage.

That requirement also seems appropriate, as the entirety of information on this issue is exclusively within Plaintiffs' possession. In other words, given that the mandated inquiry focuses solely on the actions that *Plaintiffs themselves* took to compare their prices to market rates, discovery from Emery (or All Star) would offer Plaintiffs little assistance in rounding out that claim. And, as it appears clear that they will need to be able to prove this diligence at summary judgment, *see Lutz II*, 2020 WL 1651625, at *3–4, there is no reason to provide them access to discovery—with all its attendant costs—if they are ultimately destined to fail as a matter of law. This is what the "plausibility" requirement is all about.

In sum, the Court holds that, where the claimed harm in a given case is a divergence between market prices and the price actually charged (or paid), the plaintiff must allege at the pleading stage facts regarding their efforts to compare the price charged (or paid) to market prices, or alternatively, plead facts showing why that comparison would not have revealed the harm. Plaintiffs have not done so here.

Indeed, if anything, the factual allegations in their Amended Complaint actually hurt the Plaintiffs in this regard. Perhaps most notably, the Plaintiffs contend that Emery and All Star conspired to allocate costs, such that a *higher*

number appeared in block 4 of the good faith estimate that each Plaintiff received early on in their mortgage transaction. (*See* Am. Compl. at ¶ 608–10, #686). The number in block 4, according to Plaintiffs, should have been limited to the charge for title services, but here was grossed up to include the kickback amount. (*See id.* at ¶¶ 609–10). But the point of a good faith estimate, including block 4 of that estimate, is to allow a person to shop the mortgage transaction with competing settlement service providers. Had Plaintiffs done so, presumably they would have discovered whether the quoted price in block 4 was artificially high, as they now claim.

Having failed to include any allegations regarding their efforts to compare the price they were charged to the market price, their attempt at using fraudulent concealment to toll the statute of limitations fails as a matter of law. That being said, the Court will grant Plaintiffs leave to file a second amended complaint addressing, if they can, the shortcomings identified herein with appropriate allegations supporting tolling. Any such amended complaint shall be filed not later than twenty-eight days from the date of this Order.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Emery's Motion to Dismiss (Doc. 20) and **DISMISSES** the Amended Complaint (Doc. 17) **WITHOUT PREJUDICE**. The Court allows Plaintiffs twenty-eight days from the date of this Order to file an amended complaint addressing the deficiencies set forth above.

**SO ORDERED.**

May 11, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

27