**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
CINCINNATI DIVISION**

| | |
|---|---|
| **EDWIN AND SHANNA SOLIS** 46460 Midway Drive Lexington Park, MD 20653 **JAMES GILBERT** 6758 Canterbury Road Felton, DE 19943 *Plaintiffs*, v. **EMERY FEDERAL CREDIT UNION** 7890 East Kemper Road Cincinnati, OH 49867 <u>Serve on:</u> Emery Federal Credit Union 7890 East Kemper Road Cincinnati, OH 49867 *Defendant*. | Civil Action No.: 1:19-cv-00387 Judge Douglas R. Cole |

<u>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs Edwin Solis, Shanna Solis, and James Gilbert, by and through their attorneys,

Gregory M. Utter, Sarah V. Geiger, and Melissa S. Matthews of Keating Muething & Klekamp,

PLL; Michael Paul Smith and Melissa L. English of Smith, Gildea & Schmidt, LLC; and Timothy

F. Maloney, Veronica B. Nannis, and Megan Benevento of Joseph, Greenwald and Laake, P.A.,

file this Second Amended Complaint, sue the Defendant for cause, claim damages, and state as

follows:

<u>**INTRODUCTION**</u>

1.     Plaintiffs Edwin and Shanna Solis (the "Solis Plaintiffs") and James Gilbert ("Plaintiff

       Gilbert") (together with the Solis Plaintiffs, "Plaintiffs") are victims of an illegal kickback

- 1 -

and racketeering scheme ("Emery-All Star Scheme") between Defendant Emery Federal Credit Union ("Emery") and All Star Title, Inc. ("All Star"), a Maryland title and settlement services company.

## PARTIES

2.    Plaintiffs Edwin and Shanna Solis are citizens and residents of St. Mary's County, Maryland.

3.    Plaintiff James Gilbert is a citizen and resident of Kent County, Delaware.

4.    Defendant Emery Federal Credit Union is a federally chartered credit union with its headquarters and principal place of business located in Cincinnati, Ohio, located in Hamilton County, Ohio.  It is engaged in the business of consumer mortgage brokering, origination and/or lending, and otherwise transacted business in Ohio and elsewhere.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a).

6.    This Court has personal jurisdiction over the parties.  Personal jurisdiction over Emery is appropriate because Emery maintains its principal place of business in this District and currently transacts business in this District.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

8.    Plaintiffs' claims are properly joined in this action because their claims arise out of the same fraudulent scheme and same transactions, or series of transactions, undertaken in furtherance of the fraudulent scheme by the branch manager, loan officers and others employed by Emery.

## FACTUAL ALLEGATIONS

9.      During the relevant time period, Emery operates a branch office located at 7929 Honeygo Boulevard in White Marsh, Maryland, 21236 (the "Emery White Marsh Branch").

### A. The Solis Plaintiffs Obtain a Loan from Emery and are Victims of the Emery-All Star Scheme.

10.     On or about March 2013, Plaintiffs Edwin and Shanna Solis obtain a residential mortgage loan from Emery through Craig Dowling, a mortgage loan originator employed by Emery at the Emery White Marsh Branch, in relation to the refinance of a loan secured by the Solis Plaintiffs' primary residence at 46460 Midway Drive, Lexington Park, Maryland 20653.

11.     The Solis Plaintiffs' Emery loan was a federally related loan for the purposes of RESPA. The Solis Plaintiffs' Emery loan was an FHA no cash out streamline refinance to which none of RESPA's statutory exemptions apply. *See* Solis Loan Application attached as **Exhibit 1**.

12.     The Solis Plaintiffs' Emery loan closes on or about March 18, 2013.  *See* Solis Plaintiffs' HUD-1, attached as **Exhibit 2**.

13.     Dowling assigns and refers the Solis Plaintiffs' loan (along with at least five other Emery loans during March 2013) to All Star for title and settlement services as quid pro quo for a total of $1,757.88 in kickbacks All Star paid Emery in February 2013.

14.     The kickbacks are laundered through two Tennessee-based marketing companies used by Emery for marketing services, Influence Direct LLC ("Influence Direct") and Lendanear Data and Direct Mail Services ("Lendanear").   Sham invoices, attached as **Exhibit 3**, document Emery's receipt and acceptance of the kickback through Influence Direct and

Lendanear.  These kickbacks are paid by All Star and received and accepted by Emery over interstate wires.

15.    Dowling identifies the Solis Plaintiffs' loan on an accounting to All Star of the number of loans assigned and referred by Emery to All Star in exchange for the kickbacks. *See* Apr. 6, 2013 email from C. Dowling to J. Horwitz attached as **Exhibit 4**.

16.    Emery and All Star charge the Solis Plaintiffs $1,105.56 in total title and settlement service fees, including $403 in title insurance premium, $420.12 Title Examination, and $282.44 Abstract.  *See* **Exhibit 2**, at Lines 1100, 1109, 1110.

17.    The Solis Plaintiffs' charges for title and settlement services were unnecessarily increased by the illegal kickbacks Emery received and accepted from All Star.  Emery and All Star charge unnecessarily increased title and settlement service charges to fund the kickbacks.

18.    The total amount Emery and All Star charge for settlement services related to the Solis Plaintiffs' loan are unnecessarily increased and not reasonable and customary for the area where the Solis Plaintiffs live.  Data compiled by Emery's correspondent lender from the Department of Housing and Urban Development ("HUD") identifies that the average total cost for title examination, search and abstract for transactions related to properties located in Maryland is $322.18, with a median total cost of $260.  *See* HUD Settlement Charges Chart attached as **Exhibit 5**.  At $702.56, the amounts Emery and All Star charge related to the Solis Plaintiffs' Emery loan are more than double the state average and triple the state median.  This overcharge is further supported by the bill All Star received related to the title examination it performed on the Solis Plaintiffs' Emery loan, for which All Star paid only $70.

- 4 -

19.    In addition, Emery's loan officers, including Dowling, are on notice that when the total for title exam, search and abstract exceed a state's 80th-percentile, the charges are not reasonable and customary under HUD regulations governing government insured and guaranteed loans.  *See* Mar. 22, 2012 email from C. Dowling to J. Horwitz, attached as **Exhibit 6**.  The charges related to the Solis Plaintiffs' loan are far above the 80th percentile and not reasonable and customary.

20.    The title and settlement service charges on the Solis Plaintiffs' Emery loan include at least $200 that Emery and All Star charge to fund the kickbacks and that is not associated with any legitimate title and settlement service ("Kickback Overcharge").  To conceal the Kickback Overcharge, Emery and All Star falsely and fraudulently allocate the amounts associated with the Kickback Overcharge to the amounts associated with seemingly legitimate title and settlement service, such as the title examination and abstract.

21.    This allocation of the Kickback Overcharge is false and fraudulent because the Kickback Overcharge is not associated with any legitimate title and settlement service and the allocation intentionally creates the false impression that the amount is associated with a legitimate title and settlement service.

22.    Emery and All Star include these false allocations on the Solis Plaintiffs' Good Faith Estimate and HUD-1 Settlement Statement.  These false representations on the Solis Plaintiffs' Good Faith Estimate and HUD-1 Settlement Statement prevent the Solis Plaintiffs from discovering that they are being charged and paying an amount not associated with any legitimate title and settlement service.

23.    In addition, Emery and All Star falsely allocate the Kickback Overcharge to those categories of title and settlement service fees that will not be included in the calculation of

the Annual Percentage Rate ("APR") on the Solis Plaintiffs' Emery loan.   This results in an APR that is false and fraudulently minimizes the APR associated with the Solis Plaintiffs' Emery loan.

24.   Emery and All Star include these falsely minimized APRs on the Solis loan documents, including their Truth in Lending Act ("TILA") disclosure.  *See* Solis TILA Disclosure attached as **Exhibit 7**.

25.   This false APR prevents the Solis Plaintiffs from discovering that Emery and All Star are charging unnecessarily increased title and settlement service fees.

26.   This false APR falsely minimizes the cost of the title and settlement service charges associated with the Solis Plaintiffs' Emery loan and prevents the Solis from further investigation into the title and settlement service charges associated with their Emery loan. The false APR also makes it impossible to accurately compare the cost of the Solis Plaintiffs' Emery loan to loans (and related title and settlement service charges) from other lenders, preventing the Solis Plaintiffs from discovering the unnecessarily increased title and settlement service charges, even on further investigation.

27.   Emery is required by law to complete form HUD-920900-A, "Direct Endorsement Approval for a HUD/FHA-Insured Mortgage."  On this form, Emery, as the agent of its correspondent lender Fifth Third Mortgage, must certify truthfully that "no charge has been made to paid by the borrower except as permitted under HUD regulations."  These include the HUD regulations that prohibit kickbacks and require borrowers be charged amounts for title and settlement service fees that are "reasonable and customary". *See* 24 C.F.R. §203.27.

28.     Despite charging title and settlement service fees on the Solis Plaintiffs' Emery loan that are not reasonable and customary as described in ¶19, above, Emery falsely certifies to the Solis Plaintiffs on the Direct Endorsement form that the charges for title and settlement services associated with Solis Plaintiffs' Emery loan comply with all HUD regulations. *See* Solis Plaintiffs' Direct Endorsement attached as **Exhibit 8**.

29.     This false and fraudulent certification further prevents the Solis Plaintiffs from discovering that the charges associated with their Emery loan include amounts not associated with any legitimate title and settlement service, are unnecessarily increased to pay for the illegal kickbacks Emery has been paid by All Star in exchange for the Solis Plaintiffs' Emery loan, and are not reasonable and customary.

30.     All Star disburses proceeds from the Solis Plaintiffs' Emery loan in payment of the title and settlement service charges as reflected on the Solis Plaintiffs' HUD-1.  *See* **Exhibit 2**.

    **B. Plaintiff Gilbert Obtains a Loan from Emery and is a Victim of the Emery-All Star Scheme.**

31.     On or about September 2012, Plaintiff James Gilbert obtains a residential mortgage loan from Emery through James Ventura, a loan officer Emery employs in the Emery White Marsh Branch, in relation to the refinance of Plaintiff Gilbert's primary residence at 6758 Canterbury Road, Felton, Delaware 19943.

32.     Plaintiff Gilbert's Emery loan closes on or about September 21, 2012.  *See* Plaintiff Gilbert's HUD-1, attached as **Exhibit 9**.

33.     Plaintiff Gilbert's Emery loan was a federally related loan for the purposes of RESPA. Plaintiff Gilbert's Emery loan was a VA streamline refinance with no cash out to which none of RESPA's statutory exemptions apply.

34.    Ventura assigns and refers Plaintiff Gilbert's loan (along with at least ten other Emery loans in August and September 2012) to All Star for title and settlement services as quid pro quo for a total of $2,839.89 in kickbacks All Star paid Emery in August and September 2012.

35.    Similar to the kickbacks associated with the Solis Plaintiffs' Emery loan, the kickbacks associated with Plaintiff Gilbert's Emery loan are laundered through Influence Direct. Sham invoices, attached as **Exhibit 10**, document Emery's receipt and acceptance of the kickbacks through Influence Direct. These kickbacks are paid by All Star and received and accepted by Emery over interstate wires.

36.    All Star Marketing Representative Rob Selznick and Emery White Marsh Branch Manager Bryan McCrea identify Plaintiff Gilbert's Emery loan in an email in which Emery is accounting to All Star the number of loans assigned and referred by the Emery White Marsh Banch in exchange for the kickbacks. *See* Oct 10, 2012 email from R. Selznick to B. McCrea attached as **Exhibit 11**.

37.    Emery and All Star charge Plaintiff Gilbert $1,855.60 in total title and settlement service fees, including $602.80 in title insurance premiums, $802.80 for a title examination, and a $450 attorney fee. *See* **Exhibit 9**.

38.    The total amount Emery and All Star charge for settlement services related to Plaintiff Gilbert's loan are unnecessarily increased and not reasonable and customary for area where Plaintiff Gilbert lives. The average total cost for title examination, search and abstract for transactions related to properties located in Delaware is $177.25, with a median total cost of $115. *See* **Exhibit 5**. At $802.80, the amounts Emery and All Star charge related to Plaintiff Gilbert's Emery loan are more than quadruple the Delaware state average and close to seven times the Delaware state median. *See* **Exhibit 5**.

39.     The charges related to Plaintiff Gilbert's Emery loan are far above the Delaware 80th percentile and not reasonable and customary. *See* **Exhibit 5**.

40.     Plaintiff Gilbert's charges for title and settlement services were unnecessarily increased by the illegal kickbacks Emery received and accepted from All Star.   Emery and All Star charged unnecessarily increased title and settlement service charges to fund the kickbacks.

41.     The title and settlement service charges on the Plaintiff Gilbert's Emery loan include at least $200 that Emery and All Star charge to fund the kickbacks and that is not associated with any legitimate title and settlement service.  To conceal this Kickback Overcharge, Emery and All Star falsely and fraudulently allocate the amounts associated with the Kickback Overcharge to the amounts associated with seemingly legitimate title and settlement service, such as the title examination and abstract.

42.     This allocation of the Kickback Overcharge is false and fraudulent because the Kickback Overcharge is not associated with any legitimate title and settlement service and the false allocation creates the false impression that the amount is associated with the title and settlement service.

43.     Emery and All Star include these false allocations on Plaintiff Gilbert's Good Faith Estimate and HUD-1 Settlement Statement. *See, e.g.,* **Exhibit 9** at Line 1109, and GFE/HUD-1 comparison at 3.  These false representations on Plaintiff Gilbert's Good Faith Estimate and HUD-1 Settlement Statement prevent Plaintiff Gilbert from discovering that he is being charged and paying an amount not associated with any legitimate title and settlement service.

44.     In addition, Emery and All Star falsely allocate the Kickback Overcharge to those categories of title and settlement service fees that will not be included in the calculation of

the APR on Plaintiff Gilbert's Emery loan.  This results in an APR that is false and fraudulently minimizes the APR associated with Plaintiff Gilbert's Emery loan.

45.  Emery and All Star include these falsely minimized APRs on Plaintiff Gilbert's loan documents including his TILA disclosure.

46.  This false APR prevents Plaintiff Gilbert from discovering that Emery and All Star are charging unnecessarily increased title and settlement service fees.

47.  This false APR falsely minimizes the cost of the title and settlement service charges associated with Plaintiff Gilbert's Emery loan and prevents Plaintiff Gilbert from further investigation into the title and settlement service charges associated with his Emery loan. The false APR also makes it impossible to accurately compare the cost of Plaintiff Gilbert's Emery loan to loans (and related title and settlement service charges) from other lenders, preventing Plaintiff Gilbert from discovering the unnecessarily increased title and settlement service charges, even on further investigation.

48.  Emery is required by law to complete a Direct Endorsement form for Plaintiff Gilbert's VA loan.  On this form, Emery, as the agent of its correspondent lender Grand Bank, must certify truthfully that "no charge has been made to paid by the borrower except as permitted under HUD regulations."  These include the HUD regulations that prohibit kickbacks and require borrowers be charged amounts for title and settlement service fees that are "reasonable and customary." *See* 38 C.F.R. §36.4313(d)(1)

49.  Despite charging title and settlement service fees on Plaintiff Gilbert's Emery loan .that are not reasonable and customary as described in ¶39, above, Emery falsely certifies to Plaintiff Gilbert on the Direct Endorsement form that the charges for title and settlement services associated with Plaintiff Gilbert's Emery loan comply with all HUD regulations.

50. This false and fraudulent certification prevents Plaintiff Gilbert from discovering that the charges associated with their Emery loan include amounts not associated with any legitimate title and settlement service, are unnecessarily increased to pay for the illegal kickbacks Emery has been paid by All Star in exchange for Plaintiff Gilbert's Emery loan, and are not reasonable and customary.

51. All Star disburses proceeds from Plaintiff Gilbert's Emery loan in payment of these title and settlement service charges as reflected on Plaintiff Gilbert's HUD-1. *See* **Exhibit 9**.

C. **Plaintiffs' Emery Loans are Part of a Pattern of Racketeering Activity Conducted by Emery and All Star in Furtherance of the Emery-All Star Scheme, A Scheme to Defraud Borrowers into Paying False and Fraudulent Title and Settlement Service Charges.**

52. By 2011, Emery and All Star conspire and agree to execute the Emery-All Star Scheme, a scheme to defraud in which Emery, by and through its branch managers, loan officers, agents and/or other employees, receive and accept illegal kickbacks in exchange for the assignment and referral of residential mortgage loans to All Star for title and settlement services ("Kickback Agreement").

53. To pay for the kickbacks, Emery and All Star conspire and agree to charge borrowers on loans assigned and referred pursuant to the Kickback Agreement false and fraudulent charges for title and settlement services, including amounts that were not associated with any legitimate title or settlement service and charged for the sole purpose of funding the illegal kickbacks.

54. Emery and All Star chose to transmit, receive and accept the illegal kickbacks over interstate wires. For example, the following kickbacks, associated with loans assigned and referred under the Kickback Agreement by the Emery White Marsh Branch, were transmitted, received and accepted over interstate wires:

A.      A total of $840.19 kickback on October 27, 2011;

B.      $154.50 kickback on November 29, 2011;

C.      $1,417.62 kickback on January 12, 2012;

D.      A total of $1,512.94 kickback on February 8, 2012;

E.      $1,371.38 kickback on February 28, 2012;

F.      $334.75 kickback on April 2, 2012;

G.      $1,371.38 kickback on April 4, 2012;

H.      A total of $1,757.88 kickback on May 2, 2012;

I.      $1,423.13 kickback on May 16, 2012;

J.      $1,345.50 kickback on June 12, 2012;

K.      $588.90 kickback on June 13, 2012;

L.      $1,345.50 kickback on June 20, 2012;

M.      A total of $1,915.58  kickback on July 3, 2012;

N.      A total of $3,699.17 kickback on July 11, 2012;

O.      $563.93 kickback on July 18, 2012,

P.      $618.15 kickback on August 1, 2012;

Q.      A total of $1,732  kickback on August 14, 2012;

R.      $558 kickback on September 5, 2012;

S.      $581.26 kickback on September 12, 2012;

T.      $1,081.58 kickback on September 19, 2012.

U.      A total of $2,365.23  kickback on September 26, 2012;

V.      $572.87 kickback on October 17, 2012;

W.      $690.80 kickback on October 24, 2012;

X.        $584 kickback on November 7, 2012;

Y.        $1,397.25 kickback on November 12, 2012;

Z.        $584 kickback on November 19, 2012;

AA.       $654 kickback on January 15, 2013;

BB.       $334.75 kickback on January 22, 2013;

CC.       $1,423.13 kickback on January 23, 2012.

DD.       $666.20 kickback on February 5, 2013;

EE.       $334.75 kickback on February 22, 2013;

FF.       $1,423.12 kickback on February 26, 2013; and

GG.       $853. 88 kickback on March 19, 2013;

Each of these kickbacks were paid in the form of a credit card authorization form originating in All Star's offices in Maryland, transmitted by email, and received and accepted by Emery in another state.

55.    In addition, Emery regularly uses the interstate U.S. Mails in furtherance of the Emery- All Star Scheme to lure borrowers into the scheme. After receiving and accepting the kickbacks, Emery often chooses to use the illegal kickbacks to produce and mail Emery solicitations to potential borrowers. These Emery solicitations generate the loans Emery assigns and refers to All Star, on which Emery and All Star charge false and fraudulent title and settlement service charges, which in turn fund and ensure the continuation of illegal kickbacks to Emery.

56.    Emery produces and mails thousands of Emery solicitations to borrowers in virtually every state in the contiguous United States and Alaska in furtherance of the scheme to defraud. For example, Emery chooses to use the kickbacks associated with loans assigned and

referred under the Kickback Agreement by the Emery White Marsh branch to produce and mail more than 100,000 Emery solicitations to borrowers in every U.S. state.

57. In addition to the fraudulent purpose of luring borrowers into the scheme to defraud, the Emery solicitations themselves are fraudulent.  The Emery solicitations state that the borrower will  save "30-40% on title fees" by using All Star.  *See* 2012 Emery White Marsh Branch mailer attached as **Exhibit 12**.  This representation is false and fraudulent because Emery and  All  Star  intend  and  charge  borrowers  unnecessarily  increased  title  and settlement  service  fees,  including  amounts  not  associated  with  any  title  or  settlement service.  The title and settlement service charges are not discounted or reduced in any way, and in fact are higher and unnecessarily increased as a result of the Emery-All Star Scheme.

58. In  addition  to  the  false  and  fraudulent  Emery  borrower  solicitations,  Emery  in  some instances chooses to use the illegal kickbacks to purchase "live transfer" leads, in which a borrower  from  a  centralized  call  center  is  transferred  "live"  to  an  Emery  broker.  This solicitation of borrowers through live transfer leads occurs over interstate wires with the borrower transferred  from  the  centralized  call  center  in  one  state  and  transferred  to  an Emery broker in another state.

59. In addition to the Emery White Marsh Branch, Emery receives and accepts kickbacks associated with loans assigned and referred by ten other Emery branches in furtherance of the Emery-All Star Scheme, including those located at:

    A.  1 Chase Street, Baltimore, Maryland;

    B.  1120 E. Churchville Road, Bel Air,  Maryland;

    C.  20122 S.  Tollgate Road, Bel Air, Maryland;

    D.  101 E. Wheel Road, Bel Air, Maryland;

    E.   350 Bynum Road, Forest Hill, Maryland;

    F.   5815 Live Oak Parkway, Norcross, Georgia;

    G.  293 Harrisonville Lake Road, Pilesgrove, New Jersey;

    H.  100 Owings Court, Reisterstown, Maryland;

    I.   8600 LaSalle Road, Towson, Maryland;

    J.   555 West Beech Street, San Diego, California; and

    K.  3207 South Cherokee Lane, Woodstock, Georgia.

60.    From 2011 through 2013, and winding up in January 2014, Emery assigns and refers more than 1,500 Emery loans to All Star under the Emery-All Star Scheme and receives and accepts more than $340,000 in illegal kickbacks. Emery reinvests virtually every penny of kickbacks into the illegal enterprise, churning out hundreds of thousands of borrower solicitations, and luring thousands of unwitting borrowers into the fraudulent scheme.

61.    The borrowers on these Emery loans are charged and pay the false and fraudulent title and settlement service charges which include amounts that are not associated with any legitimate title and settlement service. Typically, the title and settlement service fees included the Kickback Overcharge – a minimum of $200 that is not associated with any legitimate title and settlement service and charged solely for the purpose of paying for the kickbacks. *See* **Exhibit 13**, June 22, 2011 email from J. Horwitz to D. Hart discussing general structure, **Exhibit 11**, Oct, 10, 2012 email from R. Selznick to J. Horwitz. This is the minimum amount of actual damages caused Emery borrowers, including Plaintiffs, on loans assigned and referred to All Star in furtherance of Emery-All Star Scheme.

62.    Emery's officers and corporate management were aware of and allowed the scheme to defraud continue. When contacted by the Maryland Insurance Administration ("MIA")

about another fraudulent scheme in which Emery participated with a different title company, Emery's Compliance Officer, Troy Cyrus, offered to inform to the MIA on Emery's fraudulent scheme with All Star as part of Emery's negotiations in the enforcement proceeding. Cyrus made this offer in a June 2013 voicemail to Peter Brady, an Enforcement Officer of the Compliance Division of the MIA.

63. Emery benefitted from the scheme to defraud. In addition to the commissions and yield spread premiums its loan officers earned on the loans generated by the scheme to defraud, Emery earned a flat administration fee of $500 on each loan closed and funded. The 1,500 Emery loans resulting from the scheme to defraud generated more than $750,000 in these administrative fees to Emery.

### COUNT I
**The Solis Plaintiffs**
**Violation of the Real Estate Settlement Procedures Act (RESPA),**
**12 U.S.C. § 2607(a)**

64. Plaintiffs incorporate the above stated paragraphs as if restated herein.

65. The Solis Plaintiffs' mortgage loan was secured by first or subordinate liens on residential real property and was made in whole or in part by Emery and/or its affiliates, whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government. This Solis Plaintiffs' mortgage loan was a federally related mortgage loan, and the transactions related to that loan are thereby subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

66. Emery and All Star had an agreement in which Emery, by and through its branch managers, mortgage brokers, loan officers, employees and/or agents, received and accepted, things of value from All Star in exchange for the assignment and referral of business.

- 16 -

67.     Emery received and accepted things of value paid by All Star in exchange for the assignment and referral of the Solis Plaintiffs' Emery loan to All Star for title and settlement services, in violation of RESPA, 12 U.S.C. § 2607(a).

68.     Emery provided no goods, facilities or services to All Star in exchange for the things of value it received and accepted in exchange for the referral of Solis Plaintiffs' loan and is not entitled to the protection of 12 U.S.C. §2607(c)(2).  All Star paid things of value to Emery solely and exclusively for the referral of business.

69.     The payment and/or arranging of payment of kickbacks to Emery by All Star and Emery's receipt thereof in connection with the Solis Plaintiffs' loan constitutes a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

70.     Emery's fraudulent concealments as pled herein in  ¶¶21-29, prevented Plaintiffs from discovering facts giving rise to their RESPA claims within the statutory limitations period despite reasonable diligence.  The limitations period applicable to the Solis Plaintiffs' RESPA claims should be equitably tolled from the closing of the Solis Plaintiffs' Emery loan until the time the Solis Plaintiffs were first put on notice of the facts giving rise to their claims, on or about February 1, 2019.

71.     In addition and in the alternative, Emery should be equitably estopped from asserting a limitations defense because of: (1) the false and fraudulent APR reported on the Solis Plaintiff's Emery loan, and (2) the false certification of the Solis Plaintiffs' Direct Endorsement form.   These are false statements made by Emery for the purpose of

preventing, and did so prevent, the Solis Plaintiffs from discovering the facts giving rise to their RESPA claims and timely filing their claims.

**COUNT II**
**Plaintiff Gilbert**
**Violation of the Real Estate Settlement Procedures Act (RESPA),**
**12 U.S.C. § 2607(a)**

72.  Plaintiffs incorporate the above stated paragraphs as if restated herein.

73.  Plaintiff Gilbert's mortgage loan was secured by first or subordinate liens on residential real property and was made in whole or in part by Emery and/or its affiliates, whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.  Plaintiff Gilbert's mortgage loan was a federally related mortgage loan, and the transactions related to that loan are thereby subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

74.  Emery and All Star had an agreement in which Emery, by and through its branch managers, mortgage brokers, loan officers, employees and/or agents, received and accepted, things of value from All Star in exchange for the assignment and referral of business.

75.  Emery received and accepted things of value paid by All Star in exchange for the assignment and referral of Plaintiff Gilbert's Emery loan to All Star for title and settlement services, in violation of RESPA, 12 U.S.C. § 2607(a).

76.  Emery provided no goods, facilities or services to All Star in exchange for the things of value it received and accepted in exchange for the referral of Plaintiff Gilbert's loan and is not entitled to the protection of 12 U.S.C. §2607(c)(2).  All Star paid things of value to Emery solely and exclusively for the referral of business.

77.  The payment and/or arranging of payment of kickbacks to Emery by All Star and Emery's receipt thereof in connection with Plaintiff Gilbert's loan constitutes a violation of § 8(a)

of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

78.   Emery's fraudulent concealments as pled herein in ¶¶41-50, prevented Plaintiff Gilbert from discovering facts giving rise to their RESPA claims within the statutory limitations period despite reasonable diligence. The limitations period applicable to Plaintiff Gilbert's RESPA claims should be equitably tolled from the closing of Plaintiff Gilbert's Emery loan until the time Plaintiff Gilbert was first put on notice of the facts giving rise to his claims, on or about February 1, 2019.

79.   In addition and in the alternative, Emery should be equitably estopped from asserting a limitations defense because of: (1) the false and fraudulent APR reported on Plaintiff Gilbert's Emery loan, and (2) the false certification of the Direct Endorsement form associated with Plaintiff Gilbert's Emery loan. These are false statements made by Emery for the purpose of preventing, and did so prevent, Plaintiff Gilbert from discovering the facts giving rise to his RESPA claims and timely filing his claims.

<u>**COUNT III**</u>
**The Solis Plaintiffs**
**Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO),**
**18 U.S.C. § 1962**

80.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

81.   Emery is a "person" as defined under 18 U.S.C. § 1961(3).

82.   By and through their participation in the scheme to defraud, Emery and the All Star constitute the Enterprise for the purposes of 18 U.S.C. § 1962(c). For a continuous period of at least three years, Emery and All Star associate and commit the predicate acts of mail and wire fraud, which are separate and in addition to their legitimate mortgage and

settlement services operations, for the common purpose of defrauding borrowers into paying false and fraudulent prices for title and settlement services and the funneling of illegal kickbacks to Emery.

83. The activities of the Enterprise affect interstate commerce across more than 40 states.

84. Emery agreed to and did conduct and/or participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity and for the unlawful purpose of defrauding borrowers into paying false and fraudulent charges for title and settlement services related to residential mortgage, refinances, and reverse mortgages brokered or originated by Emery, and to thereby deprive borrowers of their money and/or property.

85. The repeated use of the interstate U.S. Mail and wires by Emery and All Star over a period of approximately three years and involving over 1,500 borrowers in furtherance of the All Star Scheme and the Enterprise as pled herein, constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

86. Emery has directly and indirectly conducted and participated in the conduct of the Enterprise's affairs, which affected interstate commerce in more than 40 states, through the pattern of racketeering activity pled herein, in violation of 18 U.S.C. § 1962(c).

87. Emery derives benefits from the pattern of racketeering activity All Star and Emery conduct in furtherance of the Enterprise.

88. As a direct and proximate result of Emery's participation in the scheme to defraud and the Enterprise through the pattern of racketeering activity pled herein, the Solis Plaintiffs were charged and paid unnecessarily increased title and settlement service fees and amounts not associated with any legitimate title and settlement service, and were injured and suffered actual damages in the amount of at least $200.

89.     The Solis Plaintiffs were prevented from discovering their injuries caused by the Enterprise, and the pattern of racketeering activity conducted in furtherance of the Enterprise, by Emery's conduct as pled herein, such that the Solis Plaintiffs' RICO claims did not accrue until they learned of facts putting them on notice of their injuries, on or about February 1, 2019.

90.     In addition and in the alternative, Emery should be equitably estopped from asserting a limitations defense because of: (1) the false and fraudulent APR reported on the Solis Plaintiffs' Emery loan, and (2) the false certification of the Solis Plaintiffs' Direct Endorsement form.  These are false statements made by Emery for the purpose of preventing, and did so prevent, the Solis Plaintiffs from discovering the facts giving rise to their RICO claim and timely filing that claim.

## COUNT IV
### Plaintiff Gilbert
### Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962

91.     Plaintiffs incorporate the above stated paragraphs as if restated herein.

92.     Emery is a "person" as defined under 18 U.S.C. § 1961(3).

93.     By and through their participation in the scheme to defraud, Emery and All Star constitute the Enterprise for the purposes of 18 U.S.C. § 1962(c).  For a continuous period of approximately three years, Emery and All Star associate and commit the predicate acts of mail and wire fraud, which are separate and in addition to their legitimate mortgage and settlement services operations, for the common purpose of defrauding borrowers into paying false and fraudulent prices for title and settlement services and funneling of illegal kickbacks to Emery.

94.     The activities of the Enterprise affect interstate commerce across more than 40 states.

95.     Emery agreed to and did conduct and/or participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity and for the unlawful purpose of defrauding borrowers into paying false and fraudulent prices for title and settlement services related to residential mortgage, refinances, and reverse mortgages brokered or originated by Emery, and to thereby deprive borrowers of their money and/or property.

96.     The repeated use of the interstate U.S. mail and wires by Emery and All Star over a period of approximately three years and involving over 1,500 borrowers in furtherance of the Emery-All Star Scheme and the Enterprise as pled herein, constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

97.     Emery has directly and indirectly conducted and participated in the conduct of the Enterprise's affairs, which affected interstate commerce in more than 40 states, through the pattern of racketeering activity pled herein, in violation of 18 U.S.C. § 1962(c).

98.     Emery derives benefits from the pattern of racketeering activity All Star and Emery conduct in furtherance of the Enterprise.

99.     As a direct and proximate result of Emery's participation in the Emery-All Star Scheme and the Enterprise through the pattern of racketeering activity pled herein, Plaintiff Gilbert was charged and paid unnecessarily increased, false and fraudulent title and settlement service fees and amounts not associated with any legitimate title and settlement service, and was injured and suffered actual damages in the amount of at least $200.

100.    Plaintiff Gilbert was prevented from discovering his injuries caused by the Enterprise, and the pattern of racketeering activity conducted in furtherance of the Enterprise, by Emery's conduct as pled herein, such that Plaintiff Gilbert's RICO claim did not accrue until he learned of facts putting him on notice of his injuries, on or about February 1, 2019.

101.    In addition and in the alternative, Emery should be equitably estopped from asserting a

limitations defense because of: (1) the false and fraudulent APR reported on Plaintiff

Gilbert's Emery loan, and (2) the false certification of Plaintiff Gilbert's Direct

Endorsement form.   These are false statements made by Emery for the purpose of

preventing, and did so prevent, Plaintiff Gilbert from discovering the facts giving rise to

his RICO claim and timely filing that claim.

**WHEREFORE**, Plaintiffs respectfully demand:

    a.  Judgment for the Solis Plaintiffs against Emery Federal Credit
Union and award:

        i.  the Solis Plaintiffs treble damages for title and settlement
services charged by All Star, including, but not limited to,
title insurance premiums, in an amount equal to three times
the amount of any charge paid for such settlement services,
pursuant to 12 U.S.C. § 2607(d)(2); and

        ii.  Plaintiffs' damages in the amount equal to three times the
actual damages caused by the Enterprise pursuant to 18
U.S.C. § 1964(c);

    b.  Judgment for Plaintiff Gilbert against Emery Federal Credit
Union and award:

        i.  Plaintiff Gilbert treble damages for title and settlement
services charged by All Star, including, but not limited to,
title insurance premiums, in an amount equal to three times
the amount of any charge paid for such settlement services,
pursuant to 12 U.S.C. § 2607(d)(2);

        ii.  Plaintiff Gilbert's damages in the amount equal to three
times the actual damages caused by the Enterprise pursuant
to 18 U.S.C. § 1964(c);

    c.  Reasonable attorneys' fees, interest and costs pursuant to 12
U.S.C. § 2607(d)(5) and 18 U.S.C. § 1964(c); and

    d.  For such other and further relief as this Court deems proper.

Respectfully submitted,

/s/ Gregory M. Utter                                  /s/ Michael Paul Smith
Gregory M. Utter (0032528)                           Michael Paul Smith (*Pro Hac Vice*)
Sarah V. Geiger (0093144)                            Melissa L. English (*Pro Hac Vice*)
Melissa S. Matthews (0093352)                        Smith, Gildea & Schmidt, LLC
Keating Muething & Klekamp, PLL                       600 Washington Avenue, Suite 200
1 East Fourth Street, Suite 1400                     Towson, MD 21204
Cincinnati, OH 45202                                 Phone: (410) 821-0070
Phone: (513) 579-6540                                Fax: (410) 821-0071
Fax: (513) 579-6457                                  mpsmith@sgs-law.com
gmutter@kmklaw.com                                   menglish@sgs-law.com
sgeiger@kmklaw.com                                   *Counsel for Plaintiffs*
mmatthews@kmklaw.com
*Co-Counsel for Plaintiffs*

/s/ Timothy F. Maloney
Timothy F. Maloney (*Pro Hac Vice*)
Veronica B. Nannis (*Pro Hac Vice*)
Megan Benevento (*Pro Hac Vice*)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Phone: (301) 220-2200
Fax:   (301) 220-1214
tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiffs*

## **PRAYER FOR JURY TRIAL**

Plaintiffs hereby request a trial by jury on the foregoing Second Amended Complaint.

Respectfully submitted,

/s/ Gregory M. Utter
Gregory M. Utter (0032528)
Sarah V. Geiger (0093144)
Melissa S. Matthews (0093352)
Keating Muething & Klekamp, PLL
1 East Fourth Street, Suite 1400
Cincinnati, OH  45202
Phone:  (513) 579-6540
Fax:  (513) 579-6457
gmutter@kmklaw.com
sgeiger@kmklaw.com
mmatthews@kmklaw.com
*Co-Counsel for Plaintiffs*

/s/ Timothy F. Maloney
Timothy F. Maloney (*Pro Hac Vice*)
Veronica B. Nannis (*Pro Hac Vice*)
Megan Benevento (*Pro Hac Vice*)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
Phone:  (301) 220-2200
Fax:     (301) 220-1214
tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiffs*

/s/ Michael Paul Smith
Michael Paul Smith (*Pro Hac Vice*)
Melissa L. English (*Pro Hac Vice*)
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD  21204
Phone:  (410) 821-0070
Fax:  (410) 821-0071
mpsmith@sgs-law.com
menglish@sgs-law.com
*Counsel for Plaintiffs*

10043506.1